The opinion of the court was delivered by
Huston, J.
As the events related in this cause».and the course it has passéd through, are in some respects unusual, I shall state the facts and the decision in some measure at large, and- take a view of the whole contést; for such a statement will be necessary to come to a right conclusion.
The charter under which the colony of Connecticut claimed, and that under which William Penn and his heirs claimed Pennsylvania, interfered with each other about one degree of latitude through the whole of Pennsylvania, from east- to west. Before the revolutionary war, settlers under the. colony of Connecticut began to improve a part of this land, and seventeen townships were ' surveyed and in part inhabited under this title. Battles had been fought and blood shed. The attention of the two colonies, then become states, was turned to the war for independence, which required all the energies of both; and, during this war, the contest between thé states was suspended. In 1782, the contest, as to the right of jurisdiction between the two states, was decided in favour of Pennsylvania. The articles of confederation required expressly a separate tribunal and trial, to decide the right of soil between: those who had purchased under the different charters; and. *173 to prevent misunderstanding, the commissioners, who decided the jurisdiction, expressly stated along with their decision, that they had not considered this latter question. After this, and not before, Pennsylvania assumed jurisdiction; and, the first act of the legislature, was one staying all suits brought by persons claiming under Pennsylvania, in the courts of that state. This was soon repealed. I pass over the laws and the history of the next four years willingly, though they abound in facts curious and instructive, to those attending to minute, judicial and legislative history.
In 1787, was enacted, “The act for ascertaining and confirming to certain persons, called Connecticut claimants, the lands by them claimed within the county of Luzerne, and for other purposes therein mentioned.” This act was suspended by a law of 1788, and repealed by another of 1790.
The. next remarkable event, was the trial of the case of Vanhorn’s Lessee v. Dorrance, in the Circuit Court of the United States, of which I shall only say at present, that it is not easy to determine whether the misapprehension of the facts in.the cause, or the misapplication of the law to those facts, is most conspicuous. It led to the passage of the act of the 11th of April, 1795, entitled, “ An act to prevent intrusions on lands within the counties of Northampton, Northumberland, and Luzerne,” and several supplements, by which it was provided, by section 1st, “ That if any person, after the passage of that act, should intrude or settle on any lands, &c., he should be liable to imprisonment, not exceeding one year, and a fine of two hundred dollars.” Section 2d, imposed a fine'not less than five hundred, nor exceeding one thousand dollars, “ on every person who shall combine or conspire for the purpose of surveying, possessing, or settling on any land within, &e., under any half share, right, &c., or for the purpose of laying out townships, &e.”
The following sections contained certain provisions for carrying-this law into effect.
The 16th of February, 1801, a supplement was passed, in the first section of which it was provided, that the proof of a person being actually in possession of lands within those counties, should be prima facie evidence to convict him under the first section of the preceding act, “ unless he prove that he entered upon, took possession of, or settled on said tract’ before the passage of the act of the 11 th of April, 1795.” The words of the prior act, only apply to entry after the passing of the act, arid the supplement, though a severe one, expressly exempts those who proved that they entered upon, took possession of, or settled before the passage of the act of 1795, and these facts are to be kept in mind throughout this cause.
It is true, that notwithstanding the decision in Vanhorn’s Lessee v. Dorrance, many persons were coming into this state under the Connecticut title. A company, called the Susquehannah *174 Company, claimed a large body of those lands. They had before this decision, nay, before the adjudication of 1782, sold many thousand acres; and, after both those decisions, the purchasers from this company were selling at a very reduced price, to whoever would purchase; and hundreds of honest, industrious men in the eastern states purchased what they supposed good titles, and never knew or heard otherwise, until they had removed into this state to take possession. Newspapers and reports of judicial decisions, were not so extensively circulated as at present. Although, perhaps, all those who held under the Susquehcmnah Company knew of these decisions, it is certain they found and" imposed on hundreds who never heard of them. To prevent this imposition, and to prevent the consequences of it to the individuals imposed on, and to this state, the above act. of 1795 was passed, and it had the effect: the supplement of 1801, was obtained by false representations to the legislature. I will add, that only one person, and he not defended, was ever subjected to the pains and penalties of either of those laws.
■ I now go back a year or two. In the winter of 1796-7, the Susquehcmnah Company held its last meeting; dissolved itself, and as a company agreed to close its books and make no more transfers of lands. During the same winter, the inhabitants who had settled, as before stated, petitioned the legislature of this state; and again in 1797-8; and the succeeding session enacted what is called the compromising act, under which and its supplements, this contest became extinct. In 1800, however, the legislature suspended the act of limitatiqn of suits for possession of real property, in all cases where title is, or has been, claimed under the Susquehannah Company, or in any way under the state of Connecticut. The contest ceased. The land-holders under Pennsylvania, sent agents to all parts of the disputed country. The settlers, almost to a man, purchased the Pennsylvania title: if any l’efused, or the parties could not agree on terms, suits were brought and the land recovered from the settler. It is not the least remarkable fact in this business, that the indictments under the intrusion laws, weré tried before juries composed entirely of Connecticut claimants, or those who had been so. The ejectments were tried before juries of the same description. In the first cases, where the necessary facts were proved, they found special verdicts of guilty, if the acts of assembly were constitutional; in the ejectments they found for the plaintiff, if he made out a title, and there was not one instance of a verdict against evidence, or against the law, as laid down by a Pennsylvania judge.
In January 1814, (see 6 Penn. Laws, 122,) the legislature repealed the whole list of intrusion laws, acts to protect territorial-limits, &e.; and, in 1813, repealed the law, suspending, where lands were claimed under Connecticut, the act of limitations. And then these people became entitled to the benefit of all *175 the laws of this state, and all the privileges of free men, and were subject to no other penalties, fines, forfeitures, &c. than other citizens. With these facts before us, let us proceed to examine the case trying. About 1784 or 1785, Elisha Satterlee, the defendant, and Elisha Matthewson, who was married to the defendant’s sister, went to the land in question, and each of them took possession, as is believed and was not denied, under the Susquehannah Company, of lands west of, and lands east of the Susquehannah. They worked in partnership on the lands, on both sides of the river until 1790, when it was agreed that Matthewson, who had a house on the west side, should occupy the lands of both on that side, and be the tenant of Satterlee for his part; and Satterlee moved on the lands on the east side, on precisely the same terms: let it be understood they were not tenants in common, but each had a lot on each side of the river, and it was expressly agreed, that either might put an end to the tenancy at the end of any year; and, in that case, each was to be put in possession of his own land. In 1805, Mutthewson died, having devised the possession of all his real estate to his widow during life, and after her death to his children equally. Satterlee, repeatedly, after Matthewson’s death, acknowledged the original bargain, and that he was a tenant of Matthewson’s part; but, he wished to buy it — he wished to give other lands for it, &c. In short, it was good land, and he had set his heart on it. But his sister would only sell during her life, and her children were minors. In 1810 she built a house on a part of the tract, and put a tenant in it; but her brother would not give possession of the part be had in cultivation. In 1811 she, made application, and took in January 7th, 1812, a warrant in her name, in trust for her children, and got a survey and a patent; she stated an improvement made by her husband in 1785, and paid instalments to the state on the purchase money from that date.
After his sister’s warrant, survey, and return, Elisha Satterlee purchased a Pennsylvania title, which he alleged covered the land in question; but he directed the deed to be made to his son, J. F. Satterlee, and in 1813 an ejectment was instituted in the name of the son against the father, as was expressly proved, in pursuance of a plan of the father’s, to release him from the situation of tenant to his sister. By a law then in existence, but since repealed, you might enter a rule of reference on the same day you took out your writ, and by proper diligence might, in some cases, obtain a report which had the effect of a judgment, before the return day of the writ. This process was, by means of the father waving all, objection as to time and notice, so applied, as that the son not only had judgment, but a writ of habere facias possessionem, before the return of the writ. The present Chief Justice of this court, then presided in the Common Pleas in that district: an ignorant attorney for Mrs. Matthewson, had attempted to prevent all this; but had proceeded so illegally, and was going .on so out of all rule, *176 that she could not, and did not get herself oh the record as landlady and co-defendant. And this proceeding was suffered to stand, because the proceeding bore such evidence of management, that she was expressly told if she could prove fraud, she would not be affected. <7. F. Satterlee then gave to his father a lease for life.
Mrs. Matthewson immediately instituted this ejectment. J. F. Satterlee, in 1817, procured himself to be entered co-defendant, and his father being dead, is now sole defendant.
The cause was tried and brought to this court by writ of error, and the opinion of the court below reversed two years ago. See 13 Serg. & Rawle, 133. The judge had instructed the jury, that if Elisha Satterlee was found to be the real purchaser who actually bought and paid for the land, and if they found the ejectment brought by the son, J. F. Satterlee, in whose name the conveyance was taken, was actually instituted by the father, though in his son’s name, against himself, and that the suit was all trick and so conducted, on purpose, as to prevent his sister from interfering or being heard, that he was still her tenant as much as if no such proceeding had ever taken place; but, if the son was the real purchaser, and the suit instituted and conducted bona fide, and the lease to the father during his life for a dollar a year bona fide, that then Elisha Satterlee having been evicted by due course of law, might take a lease from him who recovered, and, in that case, the relation of landlord and tenant, between him and his sister, was at an end: the cause must be decided on the respective titles of the parties. But, if they found him still a tenant, he could not set up against his landlord an adverse title purchased during his tenancy; hut he must restore the possession to his landlord, and might then institute a suit on the title he had purchased; and, if it was the best, recover from his former landlord. The verdict and judgment were for Mrs. Matthewson, and against the tenant.
On the argument of this cause in the Supreme Court, a point was made, which never had been thought of before in Pennsylvania; viz. that the relation of landlord and tenant could not exist between persons holding under a Connecticut title; and the Supreme Court, in 1825, held in this place, reversed the judgment of the Common Pleas, and awarded a venire de novo. The avowed principle on which this decision is given is, that it had been the policy of Pennsylvania, and the object of her laws, to cut up the title under Connecticut by the roots. Admit it; — and does not the repeal of all those laws containing no ordinary list of statutory crime and severe punishment show, that in the opinion of that branch of our government, within whose sphere it peculiarly lay, either the object was attained, or the means were improper?
The principle on which this cause was decided, when carried through, extended very widely: if all the ties of relationship arising from affinity of blood, or from common or statute law, were dissolved by this unhappy contest, Mrs. Matthewson coming in *177 under her husband’s will, and the guardian and trustee of her children under that will, and who in that capacity had got possession, had only to hunt up some old Pennsylvania title, buy it for nothing, and it at once released her from all the ties of nature, of. law, and of religion; and disinherited them, and made the lands her own.' Many persons had found the Pennsylvania owner and purchased from him at a low rate, with the intention to buy out Connecticut settlers, and had done so, and at once entered on a fine farm, highly improved; and even if he had given a mortgage to the Connecticut settlers, the principle of this decision avoided it: Executors might buy the title to land of which they were in possession under the will; guardians, the lands held in right of their wards, &c., &c. This is not an imaginary result from this decision; at the very next court, we had here the case of a mortgagor, who insisted the principle of this decision had cancelled his mortgage,.and left him in possession of the very finest estate in that country, and that neither bond, mortgage, law, or common justice bound him to pay for it. This court, however, held, that he was bound. ■ To be sure, they considered it as a purchase of the improvements, and not the title: see Tracy v. Overton, 14 Serg. Rawle, 311, which in effect reverses the decision of this cause in 1825.
At the next session of the legislature after the decision of this cause, a law was passed, enacting ee That the relation of landlord and tenant shall exist, and be held as fully and effectually between Connecticut settlers, and between Connecticut settlers and Pennsylvania claimants, as between other citizens of this commonwealth, on the trial of any cause now pending, or hereafter to be brought within this commonwealth, any law or usage to the contrary notwithstanding.”
This cause came on for trial a second time after the passage of the above act. The judge stated the decision of the Supreme Court above mentioned, and proceeded to read the above act, and said, by it we are bound; and if the plaintiff, in all other respects, shall be entitled to a recovery, the. mere fact of claiming through a Connecticut title, will not now deprive her of the right to such recovery. In all other respects his charge corresponded with a former one in this cause, which received the sanction of this court, and which therefore I shall not here notice.
The only exceptions here relied on by the defendant’s counsel are, that the act of assembly is unconstitutional, and void; and, which is only the same thing in another shape, that E. Matthew-son by dying, and his widow and children by continuing in possession, violated one of the laws now repealed, and that therefore the plaintiff cannot recover.
1. I shall not discuss the question, as to the power of .the legislature generally, to pass such acts as seem to them to be required, to promote the peace and welfare of the community, or to *178 establish the rights of the citizens. Admitting the position, that a law may be void, as contrary to the constitution of this state, or the United States, let.us inquire whether this one is so. To define the precise limits would be no easy task. All laws limiting the time of bringing suits, all insolvent laws, all laws instituting new tribunals, or enlarging or restraining the jurisdiction of courts, all laws admitting the inhabitants of a city or county, or township, to be witnesses, all laws creating disabilities, or removing those which existed; in fact, all laws modifying rights, or suits, or remedies, have by some one or other, been objected to as unconstitutional. They impair contracts is the allegation. That the expression impairing contracts, did not mean the same thing as impairing the force, effect, or remedy on a contract, is long known, and settled. Did the act under consideration impair any contract, or modify it or alter the remedy on it, or even change the tribunal, or vary the evidence, from what they were, when the several contracts were made? Counsel may in their zeal, determine to view a corner of a cause, and nothing but a corner; a court ought to look at the whole of it The allegations here are, that this act of assembly impaired the contract between J. Wharton and Satterlee, and the lease from J. Satterlee and his father.
It was conceded at'the former trial, and now, that in general a man who came in as tenant must deliver possession to his landlord, and cannot controvert his title in an ejectment by the landlord to recover that possession; and it is admitted that, except for the particular reason adopted by the Supreme Court, the law was applicable to this case. It has not been contended that the defendant was within any exception heretofore recognized. It is admitted, the exemption from the effect of this general rule of law was never, I do not say thought of, but certainly never applied to any preceding case, between Connecticut claimants. It was not adopted, because the old rule was unwise or inconvenient, or unjust: the sole reason for it is, to cut up the Connecticut title by the roots. Much has been said and written on the subject of retrospective laws; some of it wisely, and some of it at least, not wisely applied. To take it at the best, a retrospective decision of a court, in the application of a new and unheard of rule, by which to determine past contracts, is at least as objectionable as a legislative provision. And, if this rule is adopted, not from its justice, but a real or supposed policy, it does not mend the matter. Pei’haps a regulation on this principle, is more immediately within the scope of legislative, than of judicial power.
But suppose the legislature have pursued a certain coux’se, and enacted sundry laws expressly on the ground of general policy, and being convinced the end was obtained, or that the means were improper, should repeal all its laws on the subject, and that evidence existed or was even suspected to exist, that the evil was springing up anew, and by law, certain disabilities were imposed, *179 on a part of the community; in- a year it is completely discovered that the law was passed on information totally unfounded; may not the law be repealed, and suitors try their causes, on the law as it stood when they made their contracts, precisely as if the intermediate law had never been enacted? Judges of the Supíneme Court in Pennsylvania heretofore were confined almost the whole year to five particular spots. They had as little opportunity of information,'as to the existing state of things in remote corners of the state, as any three men in the state; and from the very nature of things, their' minds being constantly engaged in their professional business, they were as likely to trust implicitly to the first informant, as any other men; We must, however, suppose them open to conviction, and if they were either satisfied that the rule was a bad one, or that the grounds as to matter of fact, on which it was adopted, were mistaken, have they not the power to rescind it, on á second trial of the same cause, and would this be impairing contracts? A court have no more power to impair contracts than a legislature. In the case put, the party would have no right to complain; he got a temporary advantage from his own representation of the matter: when the facts and the reasoning on these facts are reviewed, he is left where he began, his cause is to be decided on-the old rules and laws in force, when his contracts were made.
If a court could then take olf at one term a disability adopted at a preceding, may not the legislature do so? The power of the legislature is in this matter, at least, as extensive as that of the court, and it is superior to that of the court, who are bound by the laws enacted on this subject, at least, as much as on any other.
In this case, the legislature have not affected any right; they have not prescribed a rule in any particular case; they have taken away a disability which they thought ought never to have been imposed, and which did not exist, when any of the contracts were made. I have left all of those contracts to be decided on the laws and regulations in force when they were made.
It is said, that if Elisha Satterlee is now turned out, as haying been a tenant, his possession will be considered the possession of his landlord, and if he brings an ejectment on his Pennsylvania title, he will be bound by the act of limitations. Be it so. He will not be the first man who, by perverseness, craft, and fraud, has lost a good title; though, by the by, I do not mean to say, he had a good title, or any title to this land; for, on a careful and full investigation, I am satisfied his Pennsylvania title lay on a tract near this, but not on this. But still, if he loses on this ground, it is not the fault of the legislature: his title, if lost in this way, was gone in 1815; the judicial disability of the plaintiff was not known until 1825, and removed in 1826, but we must take it now there never was a disability; that the law is founded on- *180 a more full investigation of facts, and more careful considera« lion to the real policy of the state, than the decision. There would not have been, in a legislature of one hundred and thirty-five, more than four or five who ever had any connexion with this title, or could be suspected of any partiality towards those whose fathers once claimed under it. In every point of view in which I can consider it, the law is not only free from objection, but is a just and wise enactment.
But another point has been raised and argued in this cause, in this court, though never presented to the Court of Common Pleas, which, though not material here, ought not to be passed over in silence.
In 1801, it was discovered that a deed conveying a title under Connecticut, as was supposed, for it did not mention whence the title was derived, was recorded in Lycoming county. The alarm was sounded, and a law was passed in 1802, That no conveyance to be made of any lands, within, &c., shall be good and effectual .to pass any right, title, &c., unless it refer to and recite the substance of a warrant and survey, or patent derived from the late proprietaries or this state; and if any judge or justice shall take the acknowledgment or proof of the execution of any deed, which does not describe the lands sold as aforesaid, or any recorder of deeds shall record, &c., each of them shall forfeit two hundred dollars, and the recorder lose his office; and, further, any person who after the 15th of June next, shall bargain, sell, dr convey, or by any means obtain, or get, or procure any pretended right or title, or make or take any promise, contract, grant, or covenant, to have any right or title of any person or persons in or to any lands, tenements, or hereditaments within this state, under the said pretended title, &c., shall forfeit the sum of two hundred dollars; and such promise, contract, or covenant, is hereby declared to be utterly void.
I lived near the scene of action, and had some part in the prosecutions, or rather the defence of those prosecuted under the acts; and for a short time there was some show of zeal against these people, and counsel not a few were employed against them; but during all that, it was supposed those who settled prior to any of the laws against intrusion were safe from those laws: more especially as the words of the law expressly subjected only those who should thereafter settle, intrude, &c.; and it did not then occur to any human being, that a widow and children when they returned from burying the husband and father of the family to the house in which they had resided, nay in which they were born, were each of them guilty of a crime for which each of them must pay two hundred dollars, and suffer a year’s imprisonment. But fifteen years after the law has been repealed, and twenty-two since the husband of E. Matthewson and father of her children, the real plaintiff, is dead, this court is gravely asked to decide that they were so liable; not *181 for the purpose of indicting them, but of in effect confiscating their lands.
As the law about selling mentioned conveyances, acknowledgments, and recording, terms never applied to wills, it was not then supposed that a man who devised his real and personal estate to his wife and children, subjected them and each of them to a penalty of two hundred dollars! There appears to have been an intention to guard against conveyances in trust, and agreements to convey, or bonds conditioned to be void on conveyance; but the law relates to the living and not to the dead: he who conveyed, and he to whom the conveyance was made, are each subjected to the same' forfeiture of two hundred dollars. . No small display of-profound learning has been exhibited in showing us the extensive meaning of the words convey, covenant, promise, contract, and it has been insisted a will is or may be comprised under all, or some one of these words. What a court would do, how far it would strain the meaning of words to make good an estate likely to be lost, or to prevent a forfeiture, I will not say; but it is not part of the prin»ciples of our law to strain and extend penal laws beyond their literal meaning, at least not beyond the supposed intent of the lawgiver1; and it was never before attempted, nor I hope never again will be, to induce a court to go back, so long after a law has been repealed, to construe a law contrary to its obvious meaning, so as to inflict a fine and imprisonment on a dead man, and each of his infant children. I feel indignant that such ah attempt should be made: it means more than meets the eye; it is intended to affect the estate of every man who died in that purchase, from its first settlement till the repeal of the law. But I leave it; the construction contended for is against the letter, the spirit, and intention of the law, as well as the general principle that all prosecutions, and all fines, forfeitures, &c., under a penal law, cease with its repeal.
There is one other matter in the opinion delivered in this cause not necessary to be considered in this case, but which I will just mention. It it said the plaintiff’s title commenced at the date of her warrant, and cannot be carried back to the commencement of the Connecticut improvements under which she originally claimed.
I do not intend to give any opinion on this point, but to suggest that it is of immense importance. I have not consulted the other judges, but I would observe, these people are permitted, nay encouraged, to take out warrants; that by law they are bound to prove the date of their improvement, even though it was made under a claim from Connecticut; that they must pay interest on the purchase money from the date of the improvement, which in most cases trebles the sum to the state, and in the new purchase was eighty pounds per one hundred acres then, ten pounds now; that the statute of limitations runs during the time they had only a Connecticut title, as well and as fast as after they get one *182 from Pennsylvania; that the state and the laws have forgotten there ever was such a title; it is only heard of in courts when a man wishes a release from the ties which hold society together, and the feelings which make life worth enduring; for no man or woman now claims or pretends to claim lands under it, unless, so far as subsequent laws have legalized it.
Duncan, J.
The property in dispute is said to be of great value. The principle involved in the inquiry, is of immense importance, as it relates to the rights of individuals, said to be violated by special legislation, and the court is requested to give their opinion as to the constitutionality of a law of the state, by the counsel of the plaintiff in error, to enable them to take the record to the Supreme Court for final decision, on the ground of the act being unconstitutional.
To understand the question, it is necessary to state what wrere the rights of the parties, plaintiff and defendant, when the action was brought, and when the judgment of the Court of Common Pleas was reversed, and the cause sent back for trial; and, having shown how they then stood, our inquiry is extended to two questions: did the act of 1826 apply to this case? And, if it did, is it constitutional?
Both parties claimed under office rights from Pennsylvania. The plaintiff, by warrant dated the 10th of January, 1812, and patent of the 19th of February, 1813, dating back the settlement of Elisha Matthewson to 1785, and they are in trust to Elizabeth, the plaintiff, his widow, and the other devisees of Elisha. The defendants, on a location of the 3d of April, 1769, in the name of John Stoner, whose right became vested in Joseph Wharton, and patented to him on the 17th of August, 1785; who, on the 1st of April, 1812, conveyed to John F. Satterlee, made'co-defendant as the landlord of Elisha Satterlee.
In 1791 or 1792, Elisha Satterlee and Elisha Matthewsonbeing brothers-in-law; and claiming under Connecticut, came to some agreement, by which Matthewson was to cultivate certain lots of Satterlee, and Satterlee certain lots of Matthewson, including this land. This arrangement we must suppose to be but temporary, and not a permanent exchange, and consider it, as a lease from Matthewson to Satterlee. After the death of Matthewson in 1805, Elisha Satterlee claimed to hold the possession, not as tenant of Matthewson, but under the pretence of exchange of property.
The matter thus rested, until this dispute between the plaintiff and Elisha Satterlee; he retaining the possession, but disclaiming to hold as tenant. In 1813, J. F. Satterlee brought an ejectment against Elisha Satterlee his father, in which Mrs. Matthew-son applied to the court to be made' co-defendant, as the landlord of Elisha Satterlee. Her application was rejected, we presume *183 on the legal ground that the court, as the law then stood, could not admit on the record any person claiming as landlord on the Connecticut right.
In the same year, a report of arbitrators under the compulsory-arbitration act, was filed in favour of the plaintiff, and judgment thereon, and a habere facias possessionem, issued in 1814, ■ to which the sheriff returned “ executed.” In 1816, Elisha Satterlee took a lease from John F. Satterlee — 'Rent one dollar a year, during the joint lives of himself and wife. In 1817 the present action was brought, a trial was afterwards had, and judgment for the plaintiff: this was removed by writ of error into this court, and in June, 1825, the judgment was reversed in this court, and a new trial awarded. The question agitated in the Supreme Court by Matthewson, was, that even granting Satterlee’s to be the elder, and the better title under Pennsylvania, yet he was estopped by the lease of 1791, under the Connecticut claim, from now contesting Matthewson’s Pennsylvania title; having come into possession as tenant, he must under every circumstance, and at all times surrender up his possession to his landlord: while the plaintiff in error contended that this rule could not be applied- to this case, because the relation of landlord and tenant never could exist between persons claiming under Connecticut, and in hostility to the rights of Pennsylvania. The late Chief Justice, than whom no man better knew the state of this controversy between .Connecticut and Pennsylvania, from the rise of the controversy to its termination, and the several acts of assembly protecting the state and,its citizens from Connecticut intrusion, and quieting the certificated districts to the Connecticut intruders, and the surrender of their unjust pretences, and taking rights under Pennsylvania, under certain forms and conditions, (this land did not fall within the certificated districts, and whatever rights these parties had, must be derived, and flow from the laws of Pennsylvania,') gave the opinion of all the members of the court, that11 the relation of landlord and tenant did not exist between the plaintiff, nor either of the defendants, after John F. Satterlee had obtained the Pennsylvania title.” 13 Serg. fy Rawle, 133. The reasons of the decision are conveyed in the simple, clear and perspicuous manner, which distinguished all the judgments of that great and excellent man, and able, and upright magistrate. Within a few months after this decision,' in the next session of the legislature, the act of the 1st of April, 1826, passed, which we are now to consider. It provides, that the relation of landlord and tenant shall exist, and be held as fully and effectually between Connecticut settlers and Pennsylvania claimants, as well as other citizens of the commonwealth, on the trial of any cause pending, or hereafter to be brought, <e any law or usage to the contrary notwithstanding.” The act does not assume the form of a declaratory act, or one of explanation, but operates retrospectively on the vested right of *184 freehold; making that law which was not law when J. F. Satterlee acquired his title; for the provision supposes that it was not the law, and was directly contrary the existing laws. One must be deaf, dumb, and blind, not to discern that the drawer of the bill had an eye to this very case, for there was no other suit pending; and, that it was a usurpation of judicial power by the legislature, a reversal of the judgment of the supreme judicial tribunal, and setting up the reversed judgment of the Court of Common Pleas, cannot reasonably be doubted. Not that the legislature so intended. Had this consequence been perceived, had they so understood the effect of this short bill, respect for that body forbids me to believe that it ever would have passed. The bill, most probably, passed in silence, and without debate. There was no notice given to the plaintiffs in error of this application to reverse the judgment of the Supreme Court; they had no opportunity of being heard by their counsel, whatever might haye been the opportunity of the adversary. But, however apparent the intent may be to provide for this very case, still if any other possible meaning can be put on it, if it is not provided for in express terms, in words and letters, it ought not to be held to include this case. It is the duty of the court not so to hold it: from respect to the legislature, we are to presume that they did not intend to do a thing so unjust, as to deprive a man of his freehold, without a trial by jury, without the judgment of his peers, and against the law of the land, and to decide the eause in their own way, when it had been decided by those to whom the constitution had assigned the. duty in another, any law or usage to the contrary notwithstanding. If the legislature intended to have reversed the judgment of the Supreme Court, and set up the judgment of the Court of Common Pleas, they should have so said. This sentiment was expressed by the present Chief Justice in his cogent argument in Bedford v. Shilling. The English decisions, where the parliament boasts of its omnipotence, as well as the decisions in the Jlmerican courts, where the legislature is limited in the exercise of the power, clearly prove, this to be the construction in all retrospective acts, even when they are constitutional. But the act does not apply to this case, because there was no dispute between Connecticut settlers and Pennsylvania claimants: both parties claimed under Pennsylvania rights, ab origine under Pennsylvania; the plaintiff under a settlement according to the laws, a bona fide personal resident settlement, followed up by a warrant founded on such settlement, and such settlement alone; Satterlee under office right of 1769, consummated by patent in 1781. Besides, the relation of landlord and tenant under Connecticut rights, was abandoned in 1812, when both parties at the same instant of time, put off the rags of Connecticut claim, and put on the garb of Pennsylvania title; the only title acknowledged by the law. The Court of Common Pleas decided in the ejectment by John F. Satterlee against Elisha Sat *185 terlee, that Mrs. Matthewson could not be received as landlord, because the law did not recognize her relationship; it would then have been unlawful in a Pennsylvania court to receive her, and the judgment in the ejectment stands unreversed. I will hereafter consider the hypothesis of the judge who tried the cause, that the Satterlees, father and son, committed a fraud on Matthewson, in acquiring the Pennsylvania title, and that the judgment might be averred against on this trial as collusive, and a fraud in fact and in law, on the Mattheioson right.
I might, in the opinion of some, with prudence stop here, and avoid the constitutional question; but as the judgment of the other members of the court is, that the act does include this case, and is constitutional, and as the opinion is called for by the plaintiffs in error, for the purpose of revisal in the highest court, it appears to me that it would be a desertion of duty to withhold my opinion, which is, that the act in question so construed, would be a direct and* palpable violation of the constitution of this state, and of the United States. I am too much indisposed to go into an extensive range of reasoning on this subject, and this is the more unnecessary, as I have lately trespassed too much on the public time in Eakin v. Raub, 13 Serg. Rawle, 353. I will therefore content myself with succinctly stating the reasons for this opinion.
1st. Law is a rule of civil conduct, which never can be brought to bear upon that which occurred before the rule was promulgated, (I will hereafter show the exception to this) for that would be prescribing a rule for that which had happened, contrary to that before prescribed.
2d. It is a law for the decision of a case, where facts have happened and events taken place, on which a perfect right has vested; and therefore it is unconstitutional to take away from a citizen a right so vested, which he was in the full enjoyment of, and to the possession of which no obstacle existed by the present law of the land.
3d. It is a law impairing the obligation of contracts, a.contract made with government; for John F. Satterlee held a title by patent from the state; he acquired a right to this tract of land, being a part of the public domains of the state, by contract; for grants of lands made by the state to individuals, are contracts within the very words of the constitution of the United States, from impairing the obligation-to which the several states are prohibited. 6 Cranch, Peck’s case. Dartmouth College v. Woodward, 4 Wheaton, 69. The patent under the act of 1785, establishing the land-office in this state, was an absolute, unconditional and irrevocable grant.
4th. Here, John F. Satterlee, for the purpose of the argument, had a right to this property, ttie exclusive, and perfect right and possession which could not be taken from him, and vested in Mat *186 thewson, for that is the effect given by the construction to this act. Calder and Wife v. Bull and Wife, 3 Dall. 386, and Vanhorn v. Dorrance. A complete title to these lands was vested in John F. Satterlee; he had the jus duplicatum, or droit droit, and to this double right the actual possession was annexed, juris et seisinse conjunctio. The act strips him of this right of property, right of possession, and actual possession, rights acquired by the present laws. In Green v. Biddle, 8 Wheat. 75, where a Kentucky statute as to payment for improvement was held unconstitutional, Judge Washington thus strongly expressed himself: “Nothing can be more clear on principles of law and reason, than that a law which denies the owner of lands a remedy to recover the possession, when withheld by any person, however innocently he may have obtained the possession, or to recover the property, or which clogs the remedy for the recovery of such right, destroys the right. Where there is no remedy to recover it, there is no right.” Now here it is not pretended, but that John F. Satterlee, until this act of 1826, possessed the most perfect right, and the undoubted and exclusive legal possession. There subsisted no relation of landlord and tenant, to interfere with his right or with his possession. No law •obliged him in the character of tenant to surrender up the possession to Matthewson, not only the possession but the right itself; for if Elisha Satterlee continued up to 1817, when the action was brought, the tenant of Matthewson, not only the possession, but the patent is lost under the act of limitation. If Elisha Satterlee, in 1812, had the right to buy in the title of Wharton, and he was not, nor John F. Satterlee, the tenant of Matthewson, the statute would not run or be a bar till 1815; so that Matthewson, by lying dormant has acquired a title by means of Satterlee’s possession since 1812 under the Pennsylvania right, which by no act she could have done, when the judgment was reversed in 1S25; for it was then decided that if Satterlee’s Pennsylvania title was better than Matthewson’s Pennsylvania title, no relation of landlord and tenant, under the Connecticut settlement, compelled him to surrender his possession. As the law was then decided to be,, Satterlee had the perfect right, which the legislature, as is contended, have thought just, and wise to deprive him of, and give it to Matthewson for his very merit of intruding, under pretence of a foreign title, into the soil of the state in disobedience of her positive laws. Yet, in the judgment of this court in 1825, this was not a merit for which he was to be rewarded, for the law said he should be punished: he had rendered the state no benefit, but did her great injury. But in one short year these laws are to be changed, and the language of the court with them; and the act of 1795, and all the laws against Connecticut intrusion are to be condemned in bulk as impolitic, oppressive, barbarous, and as fraudulent: such was not the opinion of this court in 1802, on Franklin’s trial for intrusion, 4 Dall. 255; he was indicted, and convicted for *187 conspiring with others to settle on certain lands within the limits of the county of Luzerne under a certain pretended title not derived from the authority of this commonwealth, “contrary to the form of the act of assembly &c.,” the law of 1795 was decided by the court to be constitutional in all its relations; the judgment was arrested page 316, on the ground of misdirection of the certiorari, and so the criminal escaped. But the fashion of the present day is to hold up the Connecticut intruders as innocent, and oppressed men, and to abuse those who have purchased the Pennsylvania title, and load them in terms with epithets of traitors, rogues, and knaves, and to consider that which was a crime, and many laws punished with heavy fines, and long imprisonment at hard labour, the settlement, and'holding by lease or otherwise under Connecticut right, as now a virtue, and the man a culprit who disclaims his unlawful intrusion, and becomes the rightful owner. It seems that though the tenant wa's punishable, yet still he owed lawful allegiance to his Connecticut landlord, which he never could castoff. It always stuck to him, though he returned to the allegiance of those to whom it was due. Fealty required of him to remain the villain of his Connecticut landlord, holding in subserviency to him, and good faith required of him, whenever called on, to give up the possession of that, to which he had acquired title. All this is to me utter confusion. Why is it that, a tenant cannot set up a defect in his landlord’s title, or show title in a third person during the continuance of his lease? It is because good faith, and the spirit of his contract bind him to restore the possession. He cannot change the nature of his possession; but I did not know before this act of 1826, that a lease by a Connecticut settler was a bona fide lease, and a binding contract: before this all laws, and all decisions in courts of justice had taught me a different doctrine. I had never until now understood that it was an act mala fide, for one who had leased from a Connecticut claimant to buy in a Pennsylvania title; and that it was derogatory, and contrary to good faith, having bought it, and paid for it, not to surrender it up. Even when a lease was fraudulently obtained, the tenant may show the fraud, and vacate the lease, and set up an outstanding title. 6 Binney, 47. So, if the landlord’s title had expired: how much stronger is it, when the lease was void and the title to claim under it. The reason why a tenant shall not be permitted to contest the title of his landlord, is a liberal principle for the encouragement of justice and good faith. It certainly was a departure from the strict rules of law, and therefore must not be used as an instrument of fraud; it never prevails but when the lease was taken without fraud or illegal behaviour. This case fully proves, that when the lease is fraudulent, it is itself a crime; the tenant may set up another title, and is not bound to give up the possession. The lease was void, ab initio, an offence at common law, and declared to be strictly penal by positive laws. To claim under it, subjected the tenant to *188 a very heavy punishment. If the argument of the defendants in error be good for any thing, it proves that if Elisha Satterlee had covenanted to pay a moneys rent, he must under this act, not only have given up the possession, but pay the arrears of rent for more than thirty-five years. Indeed, if Elisha Satterlee stood in therelation of a tenant to Matthewson, then this Connecticut settlement must be considered in the nature of a feudal tenure, and Elisha Satterlee to have taken the juramentum fidelitatis, or oath of fealty, and engaged to defend the Connecticut title, and going over to the enemies the Pennsylvanians, the land again reverts to his landlord, and these Connecticut settlements must be considered as having established a feudal connexion, and the settlers as an army of feudatories already enlisted,- and prepared to muster; and that this connexion always subsisted, notwithstanding all the laws to the contrary, and must now by virtue of the act of 1826, be treated as a continuing valid connexion. This will be a proper place to consider the charge of the court, in another particular, which, if the act was constitutional and embraced this case, is radically erroneous, and proceeds on a mistaken principle, that is, the conclusion of the judge, that if the purchase of John F. Saiterlee was fraudulent, being really a purchase in his name for the ' use of his father Elisha, and the suit, judgment, execution, and lease were fraudulent, for the purpose of depriving Matthewson of his right to the possession, that'there was no end of the tenancy; and he left it to the jury to find the fraud from the circumstance of the purchase being for the use of' the father, and therefore the subsequent proceedings were fraudulent, and instructed the jury that if they should be satisfied from that circumstance that the transaction was collusive, and that Elisha was thej purchaser, and the name of the son put in the deed instead of the father, for the purpose of destroying the rights of the plaintiff as landlord, then it followed that the sale and conveyance to John F. Satterlee, the judgment, ejectment, and possession under it were all collusive on the rights of Matthewson as landlord. It is clear, that Matthew-son had no right to be defrauded of; it could not be fraudulent on his rights as landlord, for landlord he was not. No one at that day could conjecture, that the legislature, forgetting all the laws that had been passed, vacating all these contracts and relations, Should set them dp twenty years after they had put them down, and should now make that an act of disloyalty in Elisha Salter-lee, which was in obedience to her own laws; for the court make the very act of instituting a. suit on a Pennsylvania title, a fraud on her laws. Neither John F. Satterlee nor Elisha Satterlee could aver this judgment to be fraudulent, they being parties to it: a mere stranger whose interest was not affected by it, could not. Matthewson, a third party, might, if it was a fraud on her rights; but the Court of Common Pleas, for reasons that all must applaud, refused to receive Mrs. Matthewson as landlord, would not suf *189 fer one claiming under Connecticut right to defend on that right? there was no privity of estate nor of contract between Elisha Satterlee and Mrs. Matthewson: finally, the court instructed the jury on this head, that if. they believed there was no fraud in the conveyance to John F. Satterlee, nor in the proceedings on the ejectment, the defendant’s elder title, if they found an actual survey, must obtain. Now this was error, unless. w,e say that all the Pennsylvania laws, forbidding this intrusion under Connecticut claims, were a nullity, and unless we say that in 1812, it was unlawful in John F. Satterlee, or his father in his son’s name, to buy in a Pennsylvania title, and unless we say that this judgment in ejectment was fraudulent and void, and acknowledge, that Matthewson had then a right of which she was defrauded, was then the legal landlord, and now declare in this original action, that Mrs. Matthew-son ought to have been received to defend in our, courts of justice under a Connecticut right. If these principles be correct, as it is believed they are, then the act of 1826 did not embrace the case. There was no tenancy under Connecticut; if there ever had been, it was mutually dissolved by both parties abandoning that condemned and outlawed claim; and secondly, the judgment of ejectment put an end to it, and never could be overhauled by Mrs. Matthewson, in this original action the second time. It is like-. wise urged by the plaintiffs in error, that if the law was constitutional, still it does not legalize the devise to the plaintiff nor set up the will of Elisha Matthewson. I have not heard any answer to this objection, unless the act of 1826 is considered as a sovereign panacea, curing every thing that was forbidden, and setting up this Connecticut claim, as one that could be recovered, and continued in our courts of justice: certainly, when this will was null, it could not be read in a court of justice as evidence of any transfer of right, and certainly the act of 1826 does pot make it so. The right would descend to the heirs at law, and the ejectment should have been in their names: the widow could not support an ejectment in her name, and the-warrant is not in trust for the heirs, but for herself during life and then for the devisees. And the recovery in ejectment is of the possession to her. It is likewise insisted on by the plaintiffs in error, that this is an act of the.legislature reversing the judgment of this court given in this very cause. Something was said about the mode and manner in which this law. was obtained; of this, however, this court cannot take any notice, nor consider it in giving their judgment. Yet both parties agree here in their statement. One side accuses the other of impropriety in obtaining the láw, while the other boldly advances that the act was made for this very case. Wo betide the people, if such a state of legislation could exist: for the honor of the profession of the law, I do not believe it now does, that a popular lawyer, a member with a popular client, can carry a cause in this way. And after being defeated in a court of justice, can in ■ *190 effect reverse the judgment of the highest judicial tribunal,' by a legislative act without notice, without hearing and without a trial. This would shock the understanding of all men, and would , be such an outrage on the rights of property as the people would not long endure. Let such usurpation of judicial power be encouraged, the strife would be to locate the lawyers in seats in the legislature, not for the purpose of making public laws, and improving the general system of the law, but improving the causes of their clients by new provisions, new rules of property, notwithstanding any existing laws or usage to the contrary; for it is to be observed, that this act does not assume the form of a declaratory act, or one of explanation, but operates retrospectively on the vested freehold rights, making that law which was not law when the estate vested in John F. Satterlee, and when the judgment of the Supreme Court was rendered in this cause. These observations are .forced upon me by a sénse of public duty, by no means implicating any man, or intending a reflection on an honourable profession, of which I am now the oldest member in Pennsylvania. It is not necessary now to decide whether the legislature of a state can revise or correct the errors of its courts of justice. Whatever respect may be due to legislative construction, I do not think that courts of justice are bound to adopt the same construction, contrary to their own judgment, in relation to present cases; nor am I at present disposed to say, that applications to, and decisions by the legislature, in a cause pending, is a bar to a party’s rights.
The constitution intended to separate the judicial and legislative branches of government, and has provided, “ that the courts of justice shall be open, and every man for an injury done to him, in his lands, goods, person, and reputation, shall have remedy by due course of law; and that trials by jury shall be as heretofore, and the,right thereof remain inviolate.” That this land was the estate of John F. Satterlee, as the holder of the perfect title, must be admitted, before the question under the constitution can be raised. Now I do not see how, consistently with the constitution, his property could be taken from him for public use without compensation, or how his land could be taken from him and vested in Matthewson. ■ However meritorious some may think his opposition to the laws of Pennsylvania may have been, violating her territorial rights, I am clearly of opinion,' that this act, if it affects the rights of Satterlee, is a divestment of his perfect title, and vests it in Matthewson by this new rule of property, which does not even disguise its real features, (the introduction of a new right,) whatever might have been the law under which it was acquired, any law or usage to the contrary notwithstanding. It is not a law merely taking away a disability from Matthewson, hut it is a law taking away the property from Satterlee, imposing on him a disability by creating a new relation, which did not exist when he made his purchase and paid for his lands, — the disability *191 of defending his possession by converting him into a tenant. It is not a law merely making that unlawful which was unlawful before, but it makes that unlawful which was lawful before, and deprives him of his defence. From my present illness, I have been obliged to draw up this opinion at intervals of exception from pain; and therefore it comes out in a very crude and desultory state. I conclude it with this illustration. Suppose a man marries his wife’s daughter, this marriage would be incestuous and void; he dies intestate, seised of an estate which descends to his heirs, leaves children by this incestuous marriage; the heirs at law convéy to a third person: the illegitimate children bring an ejectment, obtain a verdict and judgment, which is reversed in error, for the reason that the relation of husband and wife could not exist, the legisla-, ture pass a law, declaring that this relation of marriage shall exist, in the pending cause, any law to the contrary notwithstanding, and legitimate the issue. Could this act bé set up on the new trial in this ejectment? The answer must be no. I cannot distinguish this case: if there is any difference, it is that the issue are innocent; while here the Connecticut claimants, in the very act of leasing, committed a high offence.
It has been urged in this court, that they have declared certain acts to be constitutional, which deprived individuals of their vested rights. The matter is misunderstood. The acts referred to, were those confirming irregular proceedings, defects in acknowledgments by feme coverts, of conveyance of their lands, as in the cases of Tilly v. Underwood, and Tate v. Stoolfoos, decided the last term at Lancaster. These are customary acts of legislation; not taking away a vested right, for there can be no right to do wrong: preventing one from taking an undue advantage.of mere matter of form, when the transaction is a bona fide one, and to protect bona fide purchasers; but this act is of a very different kind. It destroys an absolute, lawful contract, and sets up an unlawful one in its stead. ' It makes the right give way to the wrong. It makes a new contract without the consent of the party, and makes it relate to an antecedent time. It takes away the perfect right of one man, and vests it in another, not for public purposes or with just compensation. It reverses the judgment of the highest judicial tribunal in the state, and gives a new rule of property in a pending cause, contrary to the present rule. It makes a relation to subsist for thirty years, which never, had a legal existence, and which was indictable; and all this against the legal owner and legal title, in favour of one who claims the land; because of his transgression of the law, and a spurious title relinquished and abandoned. The controversy-between Pennsylvania claimants on Pennsylvania rights, having nothing to do with Connecticut claims, is changed by this new rule into a different channel; and made to depend on a relation forbidden by the present law, and determined judicially in the very cause not to exist. The *192 act does not in express terms include the case, and should not be extended beyond the letter. Volunt sed non dixerunt. But, if it did, then I am prepared to discharge the painful duty of declaring the act, in all its bearings and relations, to be unconstitutional and void. Here, if the judgment is affirmed, tfie Pennsylvania title is extinct by the limitation acts; the Pennsylvania claimant liable for rent, or for the mesne profits, to the Connecticut claimant; the plaintiff in error amerced in costs for prosecuting his just rights, and for reversing an unjust judgment. I lament this decision, as well on the grounds of justice and the constitution, as on that of good policy; the unhappy controversy had been put to rest by an immense sacrifice of Pennsylvania treasure, and some Pennsylvania blood; but, the flame may be revived by raising up this new doctrine. This would be regretted by all good men, and by none more than the Connecticut settlers; who now enjoy in security, by the unexampled bounty of this state, the fairest portion of her soil. I must dissent in toto, from the opinion just delivered. I could not subscribe to it without pronouncing the whole system of Pennsylvania legislation, with respect to Connecticut intrusion, to be impolitic, fraudulent, barbarous, and unnatural, and without pronouncing all the decisions from Vanhorne v. Dorrance, down to the decision of this cause in 1825, to have been founded in error and mistake: this I cannot conscientiously do, because I think the whole system was just and wise and constitutional; or.if there was a violation of the constitution, it was by a sacrifice of the rights of individuals claiming under Pennsylvania, never acquiesced in in any other country. The cutting up the Connecticut title by the roots was the avowed object of these laws; so far as the legislature has quieted a certain class of these claimants, and certain districts of country, these men are now firmly settled under the laws of Pennsylvania, and I would be the last man to travel into doctrines that would disturb them. All this has been established and rights restored; but, if this law be constitutional, what is to prevent the legislature from repealing all these quieting acts, and restoring the Pennsylvania bolder to his original rights. This district of country was not within the quieting acts, the Matthewsons not protected by them. All the title depends -on the Pennsylvania rights. Whichever of them is the oldest ought to prevail; but by affirming this judgment, we decide that the purchaser of the elder and better title under Pennsylvania is a guilty man, and must surrender up his possession to the claimant under Connecticut; that because fie once held under a lease forbidden by the law, he never can purge himself of this iniquity, by obtaining the' just title, but must surrender up his Pennsylvania title to the Connecticut claimant, who now is to be rewarded for his sufferings in opposing the law, and treated as an injured and oppressed man. The question was in its nature a question of title, a matter for the decision of a judicial tribunal. The legislature was *193 not acting in the character of a court of justice, it was exercising a sheer act of power in which it was controlled only by its own will; its act is to be supported by its power alone, and the same power, if it be one without limits, may divest any other individual of his lands, if it be the will of the legislature so to exercise it. The principle maintained by the defendant i^rror is, that a legislature may by its own act divest the jested a&tete of any man, for reasons which shall by itself be deemed sufficient. There can be no doubt but thatJohn F. Satterlee acquired the title fairly, and for a valuable consideration. The legislature of the state, by the particular provision of the constitution of the United States, was restrained from passing a law whereby the estate of the plaintiffs in error, so purchased from the state, could be constitutionally and legally impaired.
My opinion is that the judgment should be reversed.
Judgment affirmed.