## Mercer *against* Watson.

A husband and wife conveyed the estate of the wife by a deed defectively acknowledged, and after the death of the wife, the heirs at law brought an ejectment and recovered the land, and remained in possession of it for seventeen years, and until after the passage of the act of assembly, entitled " an act for the better confirmation of the estates of persons holding or claiming under *femes covert,* and for establishing a mode in which husband and wife may hereafter convey their estates." It was held : that this act cured the defect in the acknowledgement, so as to enable those who claimed under the deed, to bring an action of ejectment and recover back the land.

Nothing short of an actual, continued, visible, notorious, distinct and hostile possession of land for twenty-one years, will enable a defendant to avail himself of the statute of limitations. And if his possession be obtained by virtue of a writ of *habere facias possessionem,* the twenty-one years will commence to run from the execution of that writ, and not from the date of the demise laid in the declaration in the action wherein that issued.

An action of ejectment was brought, and a verdict and judgment for the plaintiff ; an ejectment was then brought by the defendant in the first action, and a verdict and judgment for him, which was reversed by the supreme court ; in another ejectment by the plaintiff in the second, it was held, that the verdict and judgment in the first, and reversal of the judgment in the second, were not a bar to the third ejectment.

An ejectment was brought against several defendants, some of whom were minors at the institution of the suit, but before the return day of the writ, a guardian was appointed for them, who employed counsel to defend, and who did defend. Held, that a verdict and judgment against all the defendants was good.

APPEAL from the circuit court of *Lancaster* county, held by Chief Justice *Gibson.*

This was an action of ejectment for two tracts of land, by *John Mercer,* surviving executor of *James Mercer* deceased : against *Jane Watson; David Watson* and *Esther Watson, Ann Watson, Samuel P. Watson* and *Jane J. Watson,* by their guardian *Jane Watson.* Both parties claimed title under *Samuel Patterson* deceased, who died intestate, leaving issue five children, *John, Margaret, Samuel, Joseph* and *Sarah.* In 1784, by proceedings in partition, the land was confirmed to *James Mercer* and *Margaret* his wife, in right of the said *Margaret,* who was one of the heirs of *Samuel Patterson* deceased. On the 30th of May 1785, *James Mercer* and *Margaret* his wife conveyed to *Nathan Thompson,* who, by deed of the same date, reconveyed to *James Mercer.* The will of *James Mercer,* proved the 10th of December 1804, vested his title in the plaintiff, *John Mercer,* his executor.

*Sarah Patterson,* one of the daughters of *Samuel Patterson,* deceased, was married to *David Watson,* and died, leaving issue one son, *Samuel Watson,* who also died, leaving the defendants, his widow and children. The defendants gave in evidence, the record of an action of ejectment for the land in dispute, brought to February term 1802, by the lessee of *David Watson* and wife, against

[Mercer v. Watson.]

*James Mercer*, demise laid on the 1st of February 1802, ouster the same day, which abated by the death of *James Mercer* in 1804. Another ejectment for the same land to February term 1805, by the same plaintiff, against the same defendant; demise laid in 1804, verdict and judgment for the plaintiff, removed to the supreme court, and the judgment affirmed in 1808. Ejectment to January term 1818, by *John* and *Margaret Mercer* against *Samuel P. Watson*, for the same land, and the respective parties claimed under the same title as the parties in the former ejectment; verdict and judgment for the plaintiffs, removed by writ of error to the supreme court, and the judgment reversed. Also, to August term 1809, record of an action for mesne profits, by *Watson* and wife against *Bailey* and others; verdict and judgment in 1813, for 1200 dollars damages.

Upon the judgment in ejectment, by *Watson* and wife against *Mercer*, brought to February term 1805, an *habere facias possessionem* issued to March term 1809, and the plaintiffs were then put into possession.

The present action of ejectment was brought to June term 1829, the *præcipe* dated the 6th of May 1829. All these ejectments arose out of the defective acknowledgement by the wife, of the deed from *James Mercer* and *Margaret* his wife, to *Nathan Thompson*. And this ejectment was brought in consequence of the passage of the act of the 3d of April 1826, confirming deeds by *femes covert*.

After the testimony was closed, the counsel for the defendants prayed the court to charge the jury on the following points of law, and to file their charge of record.

1. That on the death of *Margaret Mercer*, the wife of *James Mercer*, seised in fee of the lands in dispute in this cause, intestate, her husband, continuing to hold and possess them after her death and claiming to devise them as his own, was a tenant at sufferance, and his continuing in possession of them was not adverse or hostile to the true owners or the heirs at law of his wife.

2. That upon the death of *Margaret Mercer*, intestate and without issue, and the ejectment sued on the 4th day of February 1802, by her sister, *Sarah Watson*, her sole heir at law, and *David Watson*, her husband, against *James Mercer*, for the recovery of the real estate, of which the said *Margaret Mercer* died seised in fee, and which the said *James* held and withheld from her heir at law the said *Sarah*, the said *James Mercer* became a tort feasor and trespasser from the time he withheld the said fee simple estate from the said *Sarah* and her husband, and became responsible to them for damages for so withholding the said estate from the said *David Watson* and wife, in the right of the said *Sarah*, from the death of the said *Margaret Mercer*, and the descent cast, unless the plaintiff can show other title for so withholding and retaining the said possession, than that of the deeds of 30th of May 1785, by *James Mercer* and *Margaret* his wife to *Nathan Thompson*, and from said *Thompson* to *James Mercer*, given in evidence in this cause.

[Mercer v. Watson.]

3. That the alleged deed of 30th of May 1785, executed by *James Mercer* and *Margaret* his wife to *Nathan Thompson*, not being executed and acknowledged conformably to the act of assembly, passed the 24th of February 1770, " establishing a mode by which husband and wife may hereafter convey the estate of the wife," was, at the time of its execution and acknowledgement, no deed in law, but an absolute nullity, so far as it pretended to convey, or in any way affect the real estate of the said *Margaret* contained in it.

4. That as *John Mercer*, the present plaintiff, and the other defendants in the ejectment sued against them on the 4th of February 1805, in the common pleas of Lancaster county, for the recovery of the lands now in dispute in this ejectment, by *David Watson* and *Sarah* his wife, gave in evidence the deed of the 30th of May 1785, given in evidence in this cause, and insisted on it on the trial and appeal taken in that cause to be a bar to the said ejectment, by vesting the estate in *Nathan Thompson*, which his conveyance, given in evidence, vested in *James Mercer*, and tolled and defeated the descent of the said estate to *Sarah Watson*, on which points so raised and filed of record by the defendants, the supreme court, on the 31st of December 1808, decided, that the said deeds did not bar the said ejectment, and that the plaintiffs, as heirs at law, do recover the real estate of the said *Margaret* from the said defendants, which judgment given in evidence in this cause, is conclusive evidence that the said deed of the 30th of May 1785, was absolutely void, as the deed of the said *Margaret Mercer*, to convey her estate, or to prevent the descent thereof to her heir at law, the said *Sarah Watson*.

5. That it appears from the record given in evidence in this cause, that the lessee of *David Watson* and *Sarah* his wife, after the recovery stated in the fourth point above, on the　　　day of 1809, brought an action of trespass for the mesne profits against the said *John Mercer* the present plaintiff, *Francis Bailey*, *John Messencope*, and *Joseph Lefevre*, to August term 1809, No. 1, in the common pleas of Lancaster county, in which they recovered by a verdict of a jury, and the judgment of the court, 1200 dollars, showing that their possession of the lands so recovered, and the profits received was wrongful, and themselves trespassers in occupying the lands so recovered under the deed and will shown in evidence in this cause by the plaintiff.

6. That the said *Sarah Watson* died intestate, and her real estate, the lands now in dispute, descended to *Samuel P. Watson*, her only child and heir at law, before the 2d of December 1817, against whom *John Mercer* and *Margaret Mercer* brought an ejectment to January term 1818, No. 54, in the common pleas of Lancaster county, for the lands now in dispute, which being put to issue, came to trial, when the plaintiffs gave in evidence the deed of 30th of May 1785, to support the said ejectment, when the defendant requested the court to give it in charge to the jury, "that the deed of 30th of May 1785, from *James Mercer* and *Margaret* his wife, to *Nathan Thompson*,

[Mercer v. Watson.]

*prout* said deed given in evidence by plaintiff to sustain his said suit, is not duly acknowledged to convey the estate of inheritance of *Margaret Mercer* so as to destroy the descent of the estate to the defendant her heir at law." Whereupon the court charged the jury that the said deed so acknowledged was sufficient to convey the said inheritance, and bar the descent thereof to the defendant as the heir of the said Margaret, on which charge a verdict and judgment being rendered in favour of the plaintiff, and a writ of error prosecuted by the defendant *Samuel Watson*, to the supreme court to May term, 1819, and on argument, "the said court reversed the judgment of the court of common pleas in this action." The said judgment of the supreme court being given on the very deed of 30th of May 1785, was conclusive evidence that the said deed was inoperative and void to convey the estate of the said *Margaret Mercer*, and that the descents of the estate of the said *Margaret Mercer*, on her death, to her sister *Sarah Watson*, and on her death to her son *Samuel P. Watson*, were valid and legal.

7. That the two judgments of the supreme court, given in evidence in this cause on the 31st of December 1808, and on the 3d of June 1820, on the very point of the deed of the 30th of May 1785, being by each of the records specifically presented to the said court for their judgment, and that the said judgments having not only decided that the said deed was inoperative and void to show title in the defendants in the first and the plaintiffs in the second ejectment, and in no way impeded the descent, under the intestate laws, of the estate of *Margaret Mercer* to her heir at law, but that the said heir was entitled to recover thereby, the said two judgments are conclusive evidence that the said deed of the 30th of May 1785, so far as the same related to the said *Margaret Mercer*, was null and void, and never after could become a legal instrument, after her death, and the treble descent, to *Sarah Watson*, and from her son *Samuel P. Watson*, and from *Samuel P. Watson* to his children, under the said judgment and the intestate laws before the 3d of April 1826.

8. Whether, under the two judgments in the two ejectments, *John* and *Margaret Mercer* becoming voluntarily nonsuit in the ejectment to January term 1818, No. 55, on the 12th of March 1821, did not amount to an acquiescence in the previous judgment, a voluntary submission to them and an equitable and legal relinquishment of the claim to the lands in dispute; and whether under the evidence given of the ejectment in 1802, and its result, and of the ejectments in which the two judgments were rendered against the deed of the 30th of May 1785, and in favour of the heir and the three descents cast before the 3d of April 1826, and the above nonsuit, when they had the power to try and would not, be cause for a perpetual injunction in chancery against further proceeding upon said deed, and whether the same would not *a fortiori* be a bar under the statute of the 13th of April 1807, the said records showing that the specific mode in which they were presented to the supreme court was a demurrer to

all intents and purposes and equivalent thereto, taken on the deed of the 30th of May 1785, in Pennsylvania, and if not, please to state the operation of these records and judgments and nonsuit and three descents, in equity and law in this cause.

9. That this cause is barred by the statute of limitations, by the suit brought on the 4th of February 1802, by the suit brought on the 4th of February 1805, and the proceedings and judgment rendered therein, and the *habere facias possessionem* and *fi. fi.* issued and executed thereupon; also, by the action of trespass for mesne profits and the recovery therein, *prout* said records respectively given in evidence in this cause and peaceable possession and quiet and undisturbed enjoyment of the lands for which this suit is brought, until it was brought on the 6th of May 1829; the recovery of the 31st of December 1808, and its execution, extinguishing the tortious possession from the death of *Margaret Mercer* and the action of trespass compensating for the lawless intrusion, *prout* the record thereof, making the possession continuous and co-extensive with the title, under the descents and the adjudications given in evidence.

10. That the act of assembly of the 3d of April 1826, read and relied on by plaintiff according to its just and true construction, was designed for the protection of purchases made *bona fide* and for full value, only, and not to interfere in favour of volunteers, to subvert rights previously acquired by three descents and corroborated by the strongest equities and the highest legal decisions.

11. That if the said act of 2d of April 1826, entitled a supplement to an act for the better confirmation of the estates of persons holding and claiming under femes covert, and for establishing a mode in which husband and wife may hereafter convey their estates, so far as the same operates upon the right and title acquired by the defendant's ancestors, by the decision of the supreme court, on the 31st of December 1808, in the suit then pending, and given in evidence in this cause; and again, in their decision on the 3d of June 1820, in the suit given in evidence in this cause; and also by the nonsuit given in evidence in another ejectment, given in evidence; and also by the ejectment brought on the 4th of February 1802, and given in evidence in this cause; and also by the three descents proved and given in evidence in this cause, is, if the said act was intended to operate on such rights so validated, descended and confirmed, unconstitutional and void.

12. What is the operation of the act of the 3d of April 1826, upon the land sold and shown by the deeds given in evidence in this cause, if the same is holden to have a retrospection in giving efficacy to the deed of the 30th of May 1785, given in evidence in this cause?

Whereupon the court charged the jury as follows, viz.—

*Samuel Patterson* owned the land in 1785, when he died. He left three sons and two daughters. The sons died without children, so that the whole estate came to the two daughters. *Sarah*

[Mercer v. Watson]

married *David Watson* and *Margaret* married *James Mercer*. In 1785 *Margaret*, intending to give her land to her husband, joined with him in a conveyance to *Nathan Thompson*, who conveyed back to *James Mercer*. *James Mercer* and *Margaret* his wife had no children, and on her death, if the estate had continued to belong to her, it would have gone to the defendants, who are the children of her sister *Sarah*, and her heirs at law. The defendants, therefore, contend, that the conveyance to *Nathan Thompson* was void, for a defect in the certificate of acknowledgement. That has been decided against the defendants by the supreme court ; and this court and you are bound by the decision. It has been determined by the supreme court, that the act of assembly of 1826 cured the original defect. This can be overruled only by the supreme court of the United States. They can succeed, therefore, only by some other title. They claim a title by the statute of limitations. They claim to have been in the adverse possession of the premises from the death of *James Mercer*, in 1804, on the ground that the possession of the plaintiff, his executor, was their possession. If the deed from *Mercer* and wife to *Thompson*, and his conveyance to *Mercer* the husband, was good, and passed the estate to *James Mercer* (and the defendants stand in no need of the statute of limitations if they did not) this is strange doctrine. But even if these deeds were a nullity, yet the possession of the executors of *James Mercer* after the expiration of the estate of his wife, would not be under the defendants, but adverse to them. The possession of the executors contained no recognition of the defendant's title, but was inconsistent with it. But it is said, that the statute never was intended to validate the deed after the statute had run. The statute, however, could not run, if the possession of the executors, after the death of *James Mercer*, were not the possession of the defendants. It seems to me, that the possession of the executors was adverse, because they denied the title of *Sarah Watson* or her children. They held the land in trust for the uses declared in the will ; that is, to sell it, and divide the price among *James Mercer's* devisees. This is a fact for you. But the intent of the statute was to make the conveyance good by relation from its date. It could be good in no other way ; for if it were, the estate would vest for the first time in 1826, when the confirming law was passed. The statute of limitations, therefore, will not avail the defendants.

The former proceedings have been relied on as giving the defendants a title ; that is, the verdict obtained by them, a nonsuit suffered by the plaintiff, and the several descents that have taken place of the property. I see nothing in all these to stand in the way of the plaintiff's rights.. I dissent from Mr *Hopkins's* points, and cannot instruct you according to his request.

The jury found a verdict for the plaintiff, with six cents damages and six cents costs.

The defendants moved the court for a new trial on the following

[Mercer v. Watson.]

reasons filed; and the motion being overruled by the court, they appealed to the supreme court for the same reasons, viz.—

1. The honourable court misdirected the jury on each and every of the points propounded to him, and on which he charged the jury.

2. The cause is barred by the statute of limitations.

3. This cause, under the evidence given in it, would have been perpetually enjoined, and any proceedings upon it by the plaintiff; and the honourable judge, exercising in this ejectment all the powers of chancery, through the medium of the jury, ought to have charged the jury, the suit was on equitable grounds barred and that they ought to find for the defendants.

3. This cause was barred under the act of 1st of April 1807; the question propounded to the court of common pleas to charge the jury upon, and the charge upon it, and the verdict and judgment rendered upon it, being in law and equity equivalent to, and the same as a demurrer; and the verdict and judgment equivalent to a special verdict, and the same as a special verdict, and the judgment of the supreme court, reversing the said judgment, on the 3d day of June 1820, and awarding no *venire facias de novo.*

5. The two judgments rendered by the supreme court, on the 31st of December 1808, and on the 3d of June 1820, conclusively establish, that the deed of 30th of May 1785, was no deed, but a mere nullity, which never afterwards was susceptible of confirmation by any act of the legislature.

6. The act of 3d of April 1826, was never intended to, nor does it in expression, operate upon this cause; and if it did, it is unconstitutional and void.

7. The defence given in evidence in this cause, and made a part of the record, makes a case, which is under the conclusive protection of the constitution of the state of Pennsylvania, and of the constitution of the United States, and placed beyond the power of the state legislature; and if the act of 3d of April 1826, was in intention or expression operative on this defence (which we deny) the said act is unconstitutional and void.

8. The verdict in this cause is illegal, and directly contrary to the evidence in finding for the whole lands in the statement, except that contained in the parts sold, when they showed title to part only, and in not finding and specifying the quantity the plaintiff showed he had title to (supposing—though not admitting—for the sake of raising the objection), by the evidence he gave.

*Montgomery* and *Hopkins*, for appellants, argued that the act of the 3d of April 1826, was confined to *bona fide* purchasers, who, at the passage of the act, were in possession of estates by virtue of deeds defectively acknowledged by *femes covert; Tate v. Stooltzfoos,* 16 *Serg. & Rawle* 35; and any other construction would bring it into collision with the tenth section of the first article of the constitution of the United States and the seventeenth section of the ninth article of the constitution of Pennsylvania. One of the first principles of

[Mercer v. Watson.]

legislation is that all laws shall commence their operations *in futuro ;* and every construction of a law, which gives it a retrospective effect is contrary to the plain principles of enlightened jurisprudence. If this act had been passed during the pendency of the suit in 1808, this court would not have given it an application to this case, much less now, since the whole right has been settled. The application of it now is to determine that the legislature may divest a right sanctioned by the most solemn adjudication of our courts. In this same case, reported in 1 *Binn.* 470 and 6 *Serg. & Rawle* 49, the doctrine is held that the acknowledgement by a *feme covert* is of the very essence of the deed, and not mere evidence. The wife's estate never was divested ; but was in her during her life, and as certainly in her heirs after her death : can the legislature then, when twenty years have elapsed, take it from the heirs of the wife and give it to the heirs or devisees of the husband ? *Case of Dartmouth College,* 4 *Wheat.* 656 ; *Fletcher* v. *Peck,* 6 *Cranch* 87, 135, 136, and 137.

*Rogers* and *Ellmaker,* for appellees, whom the court declined to hear.

The opinion of the Court was delivered by

Kennedy, J.—The counsel for the appellants in this case, upon their argument of it, considered all the reasons assigned for taking the appeal as presenting three questions.

First. Whether the act of the general assembly of this commonwealth, passed the 3d of April 1826, entitled " a supplement to an act entitled an act for the better confirmation of the estates of persons holding or claiming under *femes covert* and for establishing a mode in which husband and wife may hereafter convey their estates," was intended to be applied to such a case as the present ; and if it were, whether in this application it is not unconstitutional and void ?

Second. Whether the plaintiff's claim is not barred by the act of limitations ?

And third. Whether the plaintiff's claim is not barred by the fourth section of the act of the general assembly, passed the 13th of April 1807, entitled " a supplement to an act to regulate arbitrations and proceedings in courts of justice," passed the 21st of March 1806, (*Purd. Dig.* 228) which declares that " where two verdicts shall in any writ of ejectment between the same parties be given in succession for the plaintiff or defendant and judgment be rendered thereon, no new ejectment shall be brought, but when there may be verdict against verdict between the same parties, and judgment thereon, a third ejectment in such case and verdict and judgment thereon shall be final and conclusive, and bar the right ; and the plea in ejectment shall be Not guilty."

As the first question was decided by this court at an adjourned session held here in November last against the appellants in another action of ejectment between these parties for the same land upon the

2 s

[Mercer v. Watson.]

same title, after a very full and elaborate argument by the same counsel that appear in this case for the appellants, it was therefore thought unnecessary to argue it again.    The decision of the circuit court upon it was against the appellants and in conformity to the decision of this court in the other case just referred to.    By that decision and others made previously, this question is considered as settled by this court against the appellants.

I will now proceed to consider the next question, in regard to the statute of limitations being a bar to the plaintiff's action.    By the second section of this act of the general assembly of this commonwealth, passed the 26th of March 1785, it is enacted, that "from henceforth no person or persons whatsoever shall make entry into any manors, lands, tenements or hereditaments, after the expiration of twenty-one years next after his, her or their right or title to the same first descended or accrued; nor shall any person or persons whatsoever have or maintain any writ of right, or any other real or possessory writ or action, for any manors, lands, tenements or hereditaments, of the seisin or possession of him, her or themselves, his, her or their ancestors or predecessors, than within twenty-one years next before such writ, action or suit so hereafter to be sued, commenced or brought."    Now it is certainly true that according to the judicial construction put upon this act, the possession of land in this state by a person for the space of twenty-one years may give him such a right to the possession of it as will not only enable him to defend and protect his possession in an action of ejectment brought against him; but in case of his being ejected by force or even under a judgment had against him in an action of ejectment, will entitle him to maintain an ejectment for the recovery of his possession of the land again.    *Pedrick* v. *Searle*, 5 *Serg. & Rawle* 240.    But the owner of the land can only be barred by such possession where it has been *actual, continued, visible, notorious, distinct,* and *hostile* or adverse for the space of twenty-one years.    *Hawk* v. *Senseman*, 6 *Serg. & Rawle* 21.    And it is not necessary that the party claiming a right under such possession should have entered upon the land under a title or even colour of title; it will be sufficient, although he were a mere trespasser.    Actual possession is one of the constituent parts of a perfect title to land, and may exist independent of the right in one who has neither the right of possession nor the right of property, and therefore may be transferred by him who has it to another who takes it after him and continues it, so that if the possession of the two added together will amount to twenty-one years it will be a bar against the owner if it has been adverse to him.    *Overfield* v. *Christie*, 7 *Serg. & Rawle* 177; *Miller* v. *Shaw*, 7 *Serg. & Rawle* 129; *Lenox* v. *Farley*, 8 *Serg. & Rawle* 392; *Royer* v. *Benlow*, 10 *Serg. & Rawle* 303; *Manshower* v. *Patton*, 10 *Serg. & Rawle* 334.    Neither is it necessary that the party should have his residence on the land to make the possession of it adverse and complete under the statute; enclosing

and cultivating it may be sufficient.  *Johnson* v. *Irwin,* 3 *Serg. &
Rawle* 291.

Now let us inquire and see when the appellants first took or got
the actual possession of the land in dispute.   They claim title to it
as the heirs at law of *Margaret Mercer* who was the wife of *James
Mercer,* under whom the plaintiff claims.   At the time *Margaret
Mercer* died, which was about the beginning of the year 1802, *James
Mercer,* the husband, was in the actual possession of the land, and
claimed it under a deed dated the 30th day of May 1785, conveying
the land in fee to him from *Nathan Thompson,* to whom *James Mer-
cer* and *Margaret* his wife, by their deed bearing the same date, had
conveyed it in fee.   This last deed was acknowledged by *James
Mercer* and his wife before a proper officer, but on account of the
certificate given by him of the acknowledgement having been made
before him, which he indorsed upon the deed, being defective, it was
adjudged afterwards, on the 31st of December 1808, by this court, in
an action of ejectment brought by the appellants against the
plaintiff, who claimed under the will of *James Mercer,* that it was
insufficient to pass the estate of *Margaret Mercer,* the wife, in whose
right the land was held until this conveyance was made by them to
*Thompson.*   The appellants, after having obtained a judgment in
their favour, took the actual possession of the land, which was de-
livered to them under a writ of *habere facias possessionem* sued out
to March term 1809.   The action, in which this judgment was
given, upon which they obtained possession, was commenced the
4th of February 1805, and the demise laid to have commenced on
th 4th of December 1804.   Previously, however, to this, they had
brought another action of ejectment to February term 1802, laying
their demise to have commenced on the 1st of February in that
year, against *James Mercer,* who was then living, but died after-
wards, in the latter end of 1804, pending the action, by which it
abated.

This present action was commenced on the 6th of May 1829.

After this statement of facts, it appears to me that if a plain unso-
phisticated mind were asked the question, At what time did the
appellants first obtain the actual possession of the land in dispute ?
that it would, without hesitation, say, Not until the spring of 1809,
when it was delivered to them under the writ of *habere facias possess-
ionem.*   Statutes are generally to be understood and construed ac-
cording to the ordinary meaning and common acceptation of their
terms.   Indeed it would be singularly strange and unreasonable
were it to be held otherwise, since they are to be regarded as rules
of civil conduct, and every one at his peril is bound to know and to
understand them.   But it has been argued most strenuously, by the
counsel for the appellants, that when they were put into the actual
possession of the land, under their recovery in the action of eject-
ment, that they were by operation of law remitted, in respect to their
possession, back at least to the 4th of December 1804, the date of the

[Mercer v. Watson.]

demise upon which the recovery was had, if not to the 1st of February 1802, the date of the demise in the first action of ejectment; and counting their possession as an actual one from either of these dates to the 6th of May 1829, when this action was commenced against them, would be a period of more than twenty-one years, and that thus they had been in the actual possession of the land; and that the plaintiff is therefore barred by the act of limitations. It seems to me that to adopt this construction of the act, in respect to what shall constitute an *actual adverse* possession and the *time* at which it shall be considered 'as having *commenced,* would be disregarding entirely the rule already mentioned, by which every one may read and understand the statute, and substituting another which could not enter into the mind of one in every fifty thousand; and at the same time would be giving to the act a meaning, in this respect, so perfectly artificial, if not fanciful, as to be unintelligible to most minds.

But again, what would be the effect of such a construction in practice? If a person who had a claim of doubtful character to land in the possession of another claiming under an adverse title, were to lie by until a few days before the twenty-one years had run and then bring his action of ejectment, laying the date of the demise in the declaration (supposing the form of the action of ejectment that was in use at the time of passing the act of limitations to be still in force) back twenty years eleven months and twenty days, the time at which his claim or title first accrued, and he should be fortunate enough to succeed on the trial of it, by obtaining a verdict and judgment, under which he is put into the actual possession of the land after the twenty-one years from the date of his demise have run; he would, according to the exposition of this act contended for by the counsel of the appellants, be protected completely, although his adversary had been in the actual and continued adverse possession of the land twenty-one years, wanting eleven or twelve days before the commencement of the action of ejectment, and more than the twenty-one years before the trial of the cause; while the successful party in the action, on the contrary, had not been more than one day, and that too after the twenty-one years from the date of his claim had run. Thus, instead of making the act a shield for him who was in the *actual* possession of the land, improving it, and by doing so adding wealth and power to the commonwealth, as was intended; would it not be turning it completely to the advantage of him who had neither been in the *actual* or *constructive* possession, but, on the contrary, lying by, out of the possession, not even making an effort to obtain it, until the twenty-one years had all but expired, when he commences his suit and, by a lucky and perhaps doubtful verdict and judgment, he is put into the *actual* possession of the land for the first time? Then, by the force of imagination, his *actual* possession of the land is made to relate back to the commencement of his title. Although the principles of the common law may in some instances

permit a fiction to prevail, in order to prevent mischief or to afford and advance a remedy for an injury sustained by the violation of a *real* subsisting right, yet it will never be allowed to work an injury, or to *create* a right or title that has no existence. The rule is, *in fictione juris semper equitas exislit ;* hence a person who has a perfectly good and available title to land, the possession of which was illegally withheld from him until he recovered it by suit, may, when thus restored to the possession, be considered by relation back as having been in during all the time he was kept out of it, so as to enable him to recover the mesne profits for that period, but he will not be permitted to invoke such *imputed* possession for the purpose of creating title or of aiding a defective one. In short, fiction is altogether inadmissible whenever it would defeat or militate against the operation of an act of the legislature.

It has also been contended that *James Mercer*, immediately upon the death of his wife, became, by the then existing law of the state, the tenant of the appellants. That he came within the description of a tenant at sufferance, by having obtained the possession lawfully through his marital rights, and continuing to hold it after the death of his wife, when his title or right ceased. 2 *Bl. Com.* 149, 150. Now, admitting the statute of 32 *Hen.* 8, ch. 28, *sec.* 6, to be in force here, and that the alienation of *James Mercer*, the husband, who was seised in right of his wife, did not, therefore, work a discontinuance of her estate, as it would otherwise have done at common law; still it cannot be doubted for a moment, but that he conceived and was firmly convinced in his own mind, that by means of the conveyance executed by him and his wife, to *Nathan Thompson*, and the reconveyance from *Thompson* to him, he became invested with a perfect indefeasible title to the land in fee simple. As corroborating evidence of this, it seems that he resisted the claim of the appellants, in consequence of which they brought an action of ejectment against him, on the 4th of February 1802. From this time, the possession of *James Mercer* was clearly adverse, and in direct opposition to the claim of the appellants. By bringing the action of ejectment against him, they declared him a trespasser, as neither holding the possession under or for them ; so that after recovering in their action of ejectment, they could not have maintained an action of *assumpsit* for the use and occupation of the land subsequently to that time. 1 *Term Rep.* 378. If *James Mercer* had at any time admitted himself to have been the tenant of the appellants, holding possession under or for them, then his possession might, with great propriety, be considered in law their possession, or at least would not have been hostile or adverse to them. The intention of the legislature as manifested in the act of limitations was, that wherever a person was permitted to hold the actual possession of land either by himself or his tenants, without recognizing or admitting right or title to it in any other, but uniformly claiming and exercising acts of ownership over it as his own, for the space of twenty-one years or upwards, that he should

[Mercer v. Watson.]

thereby acquire a right to it, the peaceable and quiet enjoyment of which thereafter should be made secure to him. It was designed most expressly as an act of repose. At the time this act was passed, the most of the lands within the state being wild and uncultivated, it was thought advisable to encourage the improvement of them, and among several acts of the legislature, passed with that view, I think, the act of limitations may be considered as one of the number. But independent of this, the legislature doubtless intended to promote and establish the peace and quiet of society, so far as securing men in the future enjoyment and peaceable possession of lands, which they had held adversely to all the rest of the world, and been improving for a space of twenty-one years or upwards, could conduce to that end. This being the main object of the act, *constructive* and *imaginary* possessions or tenancies are not to be raised when they would have a tendency to defeat this end. On the contrary, it is the duty of courts to give such construction to the act as will most effectually carry into effect the design of the legislature. See *Thompson* v. *Smith*, 7 *Serg. & Rawle* 209, 210. Under this view of this question, I am brought to the conclusion, that the appellants never had any possession of the land in dispute which the act could operate on until 1809, when they got it under their writ of *habere facias possessionem ;* and as this action was commenced against them within twenty-one years after, that they are not protected by the act of limitations.

I now come to the third question which has been presented and argued by the counsel for the appellants; and I am inclined to think that the facts in their case do not bring them within the provision of the fourth section of the act of 1807 already recited. According to the letter of it, there must be *two verdicts* and *judgments rendered thereon* in favour of the same party, in order to form a bar against another action ; but in this case the appellants never had more than one verdict in their favour, upon which a judgment was rendered by the circuit court, where it was tried, and afterwards affirmed upon appeal by the supreme court. In the action of ejectment commenced against them after they got possession of the land under the judgment in their favour, the verdict and judgment of the court thereon were against them, instead of for them ; and had this latter judgment not been reversed upon writ of error, the question, which of the parties had the better right to the land, might have been considered perfectly doubtful. It, however, has been argued, that, as this reversal of the judgment against the appellants was given without awarding a *venire facias de novo,* it ought, upon an equitable construction of the act, to be deemed equivalent to a second verdict and judgment in their favour ; and that such construction ought to be given to it, otherwise the mischief intended to be remedied will not be effected. After assuming, that the evil existing at the passage of this act, and intended to be redressed by it, was, that the parties litigating the title to land were at liberty to harass and vex each other

[Mercer v. Watson.]

with as many actions in ejectment in succession as they pleased—in short to make the strife interminable, it is contended, that the legislature, therefore, resolved to place some reasonable limitation upon such course of proceedings, by restraining the losing party from continuing the warfare after his adversary had succeeded in two different actions, by obtaining in each of them a positive judgment of a court of competent jurisdiction in his favour upon his title. And that wherever that is had in a manner which affords the party losing the same chance of success that he could have in taking the verdicts of juries and judgments of the court thereon, his case ought to be considered as embraced by the act, and coming within the plain and obvious meaning of it, although not within the letter : as, for instance, where two judgments have been rendered in favour of the same party in two successive actions, upon cases stated by the parties, or in issues joined in demurrer to the pleadings, or upon demurrer to the evidence, instead of upon two general verdicts upon the same title to the same land. Now, admitting this reasoning and view of the matter, in support of the construction which this act ought to receive, to be correct, and I think there is great force in it, still the case of the appellants falls short of those put by way of illustration. The second judgment which the appellants claim to have had in their favour, was merely a judgment of reversal, pronounced by this court ; which went no further than to ease or relieve them from the operation of a judgment considered erroneous on account of a question of law, whether a deed of conveyance had been executed and certified in such manner as to make it effectual for a certain purpose or not, having been decided incorrectly by the court below. It cannot be taken as a judgment of this court, rendered in favour of the appellants, after an examination of the whole ground of controversy, and of the respective titles of both parties. The impropriety of admitting it to have such an effect as contended for, is very apparent ; because the state of the record from the court below does not present in such case to the court above, the whole chain of title produced by the parties respectively in the court below, and under which they claimed the possession of the land ; and therefore it is, that the judgment of reversal cannot be considered a judgment concluding the parties from all further litigation of the title to the land. But in the case of an erroneous judgment being rendered in the court below upon a case stated, issue joined in demurrer to the pleadings, or on demurrer to the evidence, the court above have, by the record returned to them, a view of the whole case presented to them, and will not only reverse the judgment of the court below, but give the judgment which the court below ought to have rendered ; which is to be looked upon as the conclusion of the law resulting from all the facts and circumstances involved in the cause ; whereas a judgment merely reversing the judgment of the court below rendered upon a general verdict, may be, and often is, for a cause that does not ultimately vary or change the final determina-

[Mercer v. Watson.]

tion of the case. And to say, that the reversal of a judgment rendered upon a general verdict without awarding a *venire facias de novo*, shall cause it to have a different effect from what it would otherwise have, and make it conclusive against all further litigation of the same cause of action, would be carrying it too far, and beyond the sanction of either reason, practice or authority. It may furnish some ground to presume, that the party against whom the writ of error was sued out, or the court, or both if you please, thought, that from the nature of the case that had been declared, a *venire facias de novo* would not be likely to be available to the defendant in error, but not to prevent absolutely his bringing a new action, in case he should afterwards change his mind, or discover that he can supply what was wanting before, or in any way overcome the difficulty or objection then interposed to his recovery.

Upon the whole, I am satisfied that upon the most equitable construction, that the object assigned for the passing of the act, and, from the terms employed in it, that the legislature did not intend to bar the party from bringing a new action of ejectment for the same land, upon the same title, until after two decisions should be had against him upon a full view and consideration of the whole of his case, and all the circumstances connected with it which he might think material, either by two judgments of a court of competent jurisdiction rendered upon general verdicts, special verdicts, cases stated, or in cases of demurrrer to the pleadings or the evidence.

Beyond what the act in this behalf, upon a reasonable construction of it, will warrant, we are not at liberty to go. What a court of chancery would do or has done under similar circumstances, is not to be our guide; because I consider the act of assembly as having been given to us for the rule of our decision as to the number of actions of ejectment, verdicts and judgments that shall be a bar to any subsequent action between the same parties, upon the same title, for the same land.

The judgment of the circuit court is affirmed.

A CAUSE between the same parties, for the same land, was brought before the supreme court, by a writ of error to the district court of *Lancaster* county, which presented some points not embraced in the foregoing case; it was argued at an adjourned court held in November last.

After verdict and judgment in the circuit court below, *Jane Watson*, the mother of the defendants, presented a petition to the court, setting forth, that some of her children, who were defendants, were minors, and praying that *a writ of error coram vobis* might issue; it

[Mercer v. Watson.]

was issued, and the error was formally assigned, and the question argued. The opinion of that court embraces all the material facts, and is here given, because of the extensive examination made of the subject by his honour, the president of the court.

*A. L. Hays,* president.

The plaintiffs, on the 9th of June 1829, assigned for error that *Patterson Watson, Hetty Watson, Maria Watson* and *Jane Watson,* defendants in the action of ejectment, appeared by attorney, although at the institution of the suit, and at the time of their appearance, and at the trial and rendition of judgment, they were minors under the age of twenty-one.

To which the defendant replied by his plea, that before the return day of the writ of ejectment (which issued on the 26th of April 1826), *Jane Watson* was (viz. on the 6th of June 1826) duly appointed by the orphan's court of Lancaster county, guardian over the persons and estates of her children, the minors aforesaid ; that the said *Jane Watson,* who was co-defendant in that suit, and one of the plaintiffs in error, employed *James Hopkins* and *John R. Montgomery,* esquires, to appear as counsel in the action of ejectment, not only for the purpose of defending her own rights, but also the rights of her said wards ; that the said *James Hopkins* and *John R. Montgomery,* upon the return of the writ of ejectment, on the 12th of June ensuing, appeared for all the defendants, and entered their appearance of record, and on the 11th of September 1825, put in the plea of Not guilty for all the defendants ; that the said *Jane Watson,* guardian, &c., personally attended on the 6th of December 1826, at the trial of the cause, and that the plaintiffs in error never alleged, during the whole trial, nor until after verdict, that the minors were not defending the said ejectment by their guardian, *Jane Watson ;* that after the verdict, the defendants, on the 8th of December 1826, moved the court for a new trial, alleging as a reason the infancy of the above named minors, verified by the affidavit of *David Watson,* and not by the oath of *Jane Watson,* their guardian; and that the district court, after full hearing, discharged the rule, which had been granted to show cause.

The plaintiffs to this plea have demurred, setting forth the following causes of special demurrer, viz.

1. That the plea is argumentative, evasive, and no answer to the assignment of errors.

2. That it is contradictory and repugnant to the record.

3. That it assigns to *John R. Montgomery* and *James Hopkins,* esquires, the duty of appearing for the defendants as counsel, when that duty belongs to attorneys and not to counsel.

4. That the plea has not any relevant, pertinent or issuable matter in it ; *John Mercer* being estopped and precluded, by the record of this ejectment, from alleging any of the matters in the said plea.

2 T

[Mercer v. Watson.]

5. That the plea contains no venue.

6. That it is in other respects uncertain, informal and insufficient in law.

The defendants in error joined in the demurrer, and the court having heard the arguments of counsel and maturely considered them, I now proceed to give my opinion, with the reasons on which it is formed.

And first, as to these causes of special demurrer.

The plaintiffs object that this plea is argumentative, evasive and no answer to their assignment of errors; but they have omitted to specify in what respect or particular it is chargeable with these faults. There is nothing but the above general allegation. It is, nevertheless, perfectly settled with regard to the degree of particularity, the special demurrer must assign the ground of objection, under the statutes requiring the party to set down and express his special exceptions in demurring for form; that it is not sufficient to object in general terms, that the pleading is "uncertain, defective, informal, and the like," but it is necessary to show in what respect it is uncertain, defective, informal, &c. This objection, in the manner in which it is here stated, is nothing more than the allegation of the general demurrer repeated, and it is clearly insufficient as a ground of special demurrer.

2. They object in the second place, that the plea is contradictory and repugnant to the record. If a pleading be inconsistent with itself, that is a fatal defect on special demurrer. As in an action of trespass, the plaintiffs declared for taking and carrying away certain timber, lying in a certain place for the completion of a house, *then lately built*, the declaration was considered bad for repugnancy; for the timber could not be for the building of a house *already built*. But the objection here stated is not that the plea is repugnant in itself, but that it is repugnant to the record; which is equivalent that it is a false plea, because it is contradicted by the evidence of the record. A false plea, however reprehensible, is not to be taken advantage of by special demurrer, unless the falsity appear by the plaintiff, for, though false in fact, it may be good as to form; and in general there is no way of proving the falsehood of an allegation in pleading until issue had been taken and trial had upon it.

3. With regard to the matter of the third objection, I understand the plea as averring that *Jane Watson* employed *James Hopkins* and *John R. Montgomery*, esquires, to appear as counsel to defend her rights and those of her wards in the action of ejectment, and that they accordingly did so appear. In this there is no informality, nor any kind of inaccuracy. It is true, parties are technically and properly said to appear to suits by attorney and not by counsel; but this plea did not intend to aver a mere technical appearance of the minors by attorney, but an appearance by guardian. To have averred an appearance by attorney would have confessed the error assigned. Counsellor and counsel are terms familiar to the law. Their pro-

[Mercer v. Watson.]

vince is not simply to appear to actions, it is to conduct the suit by their advice and advocacy through all its progress and in the difficult emergencies of a trial by jury and of arguments before the court. The fact of the application of the guardian to counsel to defend the rights of her wards as well as her own, and of their actually engaging in such defence, is set forth in this plea with due formality. The third objection is therefore not sustained.

4. The fourth is, that defendant is estopped from averring any of the matters in the said plea by the record of the ejectment; and that the plea therefore contains no relevant, pertinent or issuable matters in it. The marking of the names of counsellors or attorneys in the margin of the docket is chiefly intended to notify the court and the opposite party, of the fact that such attorney or counsellor is concerned in the causes. Additional names are often marked after the regular appearance is entered, and the pleadings are concluded; and it not unfrequently happens that counsel appear, without any marginal note of the circumstance, or any entry on the record to indicate it. The omission certainly would not preclude a party from averring or showing the real state of the fact; and therefore if the attorneys' names were marked as appearing for one of several parties, evidence might still be adduced to show that he appeared for all. This objection goes the length of asserting that any entry of an attorney's name on the margin of the docket of a suit, shall estop the adverse party from showing that the attorney did not in fact appear at all, or that the party appeared by any other person. But the rule of law is, that a man shall only be estopped *by his own act or acceptance*, to say the truth. Nor will a record estop when the thing alleged is consistent with it. Therefore where the mere marginal noting may mean that the person whose name is thus marked has engaged his services as attorney or counsel, the *adverse* party especially is not precluded from saying that he appeared as counsel. For an estoppel ought to be certain to every intent; and if a thing be not directly and precisely alleged, it shall be no estoppel.

5. The fifth objection of want of venue in the plea was properly abandoned on the argument. And the

6. Sixth and last, being inoperative and insufficient on account of its generality; I find nothing in all these objections (and it is not competent to go out of the grounds specially assigned by the plaintiffs) which justly affects the form of this plea.

The question then occurs upon the substance of it, the facts therein stated being admitted by the demurrer; whether there was in the action of ejectment, a sufficient appearance for the defendants, who were minors, or not.

On the argument for a new trial no definitive opinion was formed by me upon this question. So far only I proceeded in the investigation, as to discover that it was by no means clear, that there was not good appearance by guardian, and I therefore was of opinion that there ought not to be a new trial. I state the fact now, partly be-

[Mercer v. Watson.]

cause it was assumed on the argument of the demurrer, that the the question had been decided on the former occasion, and partly in order to introduce the remark that I have, on the demurrer, taken up the subject *anew*, and investigated it without, I believe, being biassed by any preconceptions.

The first principles of justice require that they who are incapable from want of judgment and experience of transacting their own affairs, should not be permitted to become victims of the cupidity, superior knowledge, and skill of others. To this class belong infants and minors. It is accordingly declared by Justinian, in his Institutes, to be agreeable to the laws of nature, that the persons under puberty, who by reason of their unripe age are unable to protect themselves, should be under the government of such as could protect them ; and, therefore, by the civil law, guardians, who were called tutors or curators, were assigned to minors, without whose sanction no contract would bind an infant, though it was binding upon the other party.

Upon the same principle the French Code commits minors to the care of a tutor, who is to take charge of their persons, and represent them in all civil transactions, manage their property, and be accountable for the damages or injuries occasioned by their misconduct. The guardian, at common law, performs the office of tutor or curator of the Roman civil law, the former of whom, says Blackstone, had the charge of the maintenance and education of the minor, the latter the care of his fortune. Infants have various privileges and various disabilities, and even their disabilities are privileges, since their effect is to secure them from hurting themselves by their own improvident acts. They are regularly allowed to rescind all contracts *in pais* made during minority (except for schooling and necessaries), be they ever so much to their advantage; and the reason assigned is the indulgence the law has thought fit to give infants, who are supposed to want judgment and discretion in their contracts and transactions with others, and the care it takes of them in preventing them from being imposed upon or overreached by persons of more years and experience. Wanting discretion to make a contract to any amount however inconsiderable, they are, *a fortiori*, deemed incapable of safely conducting a law suit, and are therefore not suffered to endanger their rights by pursuing a claim or defending a suit in a court of justice, without the aid of some one whose judgment and ability may supply their deficiency. Hence, among the privileges conceded to infancy, is the rule that they cannot sue but by guardian or *prochein ami*, nor be sued but under the protection of their guardian, whose duty it is to defend them against all attacks, as well by law as otherwise, a rule than which none can be more extensively recognized, or established upon a better foundation.

What then is meant by an appearance and defence in an action, and particularly, when it is said that an infant shall appear and defend by guardian ? This is considered as an important privilege of the infant: justly so, for it is evident that his privileges with regard

[Mercer v. Watson.]

to contracts and other transactions would be of slight utility, if he were liable to be dragged into court and exposed there, unprotected in his ignorance, to contend with skill in business, with learning and experience.

There is no imaginable situation in which an infant would be likely to suffer more from imbecility of understanding. It may easily be seen that, under these circumstances, he would soon be stripped of his all. It is to protect him against such danger, that, the law. assigns him a guardian in the suit. This guardian is to do for him what with riper judgment he would do for himself; he is to appear for him in his proper person, employ competent attorneys and counsel to prepare and plead his cause; he is to collect testimony, summon witnesses, and at the trial to afford such aid to his counsel as may be necessary in unexpected difficulties. It is only by exercising that attention and vigilance in the cause of the minor, which he would exert in his own, that he fairly discharges his duty. When all this has been done, every thing in point of privilege has been secured to the infant which the law contemplates, or justice demands. It is something more than a mere technical defence, which is required by the guardian; for these he might furnish, and yet abandon the essential interests of his ward, by coming in at the return of the writ and entering a plea, and afterwards wholly neglecting the cause. An appearance in general is either by the suitor in his proper person, or by his attorney. But the infant cannot appear in his own person, nor can he authorize an attorney to appear for him; he can only appear by his guardian, who derives his authority, not from the infant, but from the court by which he is appointed. In England the guardian is either assigned by the court in which the suit is brought, or by writ out of chancery; every court there having the power *ex necessitate* of assigning to an infant suitor a guardian *pro lite*, and it is requisite that the guardian should be specially admitted to prosecute or defend. The guardian in case of an infant defendant, is constituted upon the infant's appearance with the person intended before a judge at his chambers, or else upon his petition accompanied by an agreement signed by the intended guardian, and an affidavit of the fact. The judge thereupon grants his *fiat*, upon which the rule or order for the admission is drawn up by the proper clerk. If the defendant does not appear by guardian in the time allowed by the rules of court, the plaintiff must procure an affidavit of the service of the writ, and that the defendant is an infant and has not appeared; upon which an order will be granted, that unless the infant appears, within six days after the personal service of the order, plaintiff may assign *John Doe* for his guardian, and enter appearance for defendant. A record of the admission is made in the common pleas, but in the king's bench it is only recited in the court, &c., as, *J S*, *per A B, guardianum suum, ad hoc per curiam specialiter admissum*, &c. But this record appears not to be essential, for where the plaintiff, being an infant, had sued by his guardian, but the entry on the roll

[Mercer v. Watson.]

was no more but *J S, guardianum suum,* omitting the clauses, *per curiam specialiter admissum,* as the common course is, *and* as it was alleged it ought to be ; but, *per curiam,* the entry is sufficient, for if, in fact, the guardian was not admitted by the court, a writ of error lies.

In the present case, *Jane Watson,* the first named defendant, and mother of the said minors, was appointed, by the orphan's court of this county, between the issuing of the writ and its return, guardian of the said minors ; she employed counsel to appear and defend her own rights and those of her wards in this suit : who accordingly appeared on the return of the writ, and afterwards entered the plea of Not guilty for all the defendants.    She moreover personally attended at the trial of the cause, which was conducted on the part of the defendants by her counsel ; and it was never alleged, during the whole of the trial, nor after verdict, that the said minors were not defending by their guardian.

But still it is contended that it was the duty of the plaintiffs in the ejectment to apply to this court, conformably to the English practice, for the purpose of having a guardian assigned *ad litem* for the defendants, who were minors.    This however was urged without adverting to the provisions of the act of assembly, passed the 27th of March 1713, by which the power of appointing guardians is vested in the orphan's courts, and the guardians so appointed are constituted *pro lite* in general, as well as for every other purpose.    The seventh section enacts that, " all guardians and *prochein amis* which shall be appointed by any of the said orphan's courts, shall be allowed and received without further admittance to prosecute and defend all actions and suits relating to orphans and minors, as the case may require, in any court or courts of this province."    Thus the necessity and with it the power of assigning guardians *ad litem* is taken from the other courts, wherever the orphan's court has made an appointment.    Nor is it by any means requisite that the orphan's court guardians should be specially admitted in the other courts, for the express language of the act is, that he shall be allowed and received *without further admittance.*    As *Jane Watson* was, at the return of the writ of ejectment, the lawful guardian of the minors in question by regular appointment of the orphan's court, any application to this court to assign a guardian *ad litem,* or to admit the guardian, would have been idle and improper.

It is to be observed, that this action was well brought.    It is not necessary that the guardian should be joined in the writ, and it was impossible in this case to connect with the minors, the name of a guardian as such, because when the writ issued there was no guardian.

But *Jane Watson* having become the guardian of her co-defendants, who were minors, and been summoned with them, they enjoyed all the advantage of being joined with their guardian in this suit to every intent.    Had she been appointed before the suit was brought, and the writ had run against *Jane Watson,* and the minors (naming

them) by the said *Jane Watson*, their guardian, and had all the proceedings up to the finding of the jury taken place precisely as they have, would there have been any ground for cavil in this case? And yet, as it would not have been necessary to have added, "by *Jane Watson* their guardian," though she were guardian, it is difficult to tell why the case would have been better with these words than without them.

But it is contended further, that the gentlemen who acted as counsel for the defendants, appeared for them as their attorneys in the ejectment, because they are in fact attorneys of the court, because their names are marked upon the record in this suit, and because counsel or counsellors are unknown to our laws.

If by our laws be meant our acts of assembly, the reference, I conceive, would be too limited to establish the position contended for, since these acts constitute but a small portion of the laws by which we are governed. But in point of fact, counsel and counsellor are terms recognized by our constitution, and by the various acts of assembly. They are terms also familiar to the language of the bar and the bench, to the reported decisions of our supreme court, and they occur in the rules of all our courts. The first of the rules of the court of common pleas of this county, which are adopted by the district court, commences thus: " no person shall be admitted to practise as attorney or counsellor at law unless," &c. It is true, the gentlemen who appeared as counsel in this case, are attorneys of the court, and that their names are marked upon the record of the present action. No conclusive argument, however, is deducible from either of these circumstances. In England, attorneys, and counsel or barristers, constitute separate and distinct orders of the legal profession; and a barrister or counsellor cannot act as attorney, unless he first apply to his society to be *disbarred*. Attorneys at law properly so called, were introduced by the statute of Westminster, 2 *C.* 10, by which suitors were first permitted to appoint agents in their place, stead or turn, to manage their matters of law in their absence; anterior to which, parties were obliged to appear in person to prosecute or defend their suits, unless by special license under the king's letters patent. Yet it seems, says *Stephens*, author of the learned and elegant treatise on the Principles of Pleading, that this is only to be understood of appearance by attorney, and not the conduct of the suit after appearance once made. *Bracton* makes express mention of pleaders, counsel and advocates in the reign of *Henry* 3, and it appears that there were persons learned in the law, and skilful in pleading causes, as early as the reign of *William Rufus*. Appearance by attorney, and appearance by counsel in a cause, are distinctly different: the former being the substitution of a legal agent for the personal attendance of the suitor; the latter, the attendance of an advocate, without whose aid, neither the party attending in proper person, nor his attorney in his stead, could safely proceed. The appearance by attorney does not, any more than the personal appearance of the suit-

[Mercer v. Watson.]

or, preclude or supersede the appearance of counsel; so neither does the appearance by guardian. The infant's privilege would be miserably abridged, if his guardian could not avail himself of the aid of counsel, in litigation with those who had the advantage of such assistance. With us, counsel are always attorneys, and by the rule just cited, members of the bar are admitted to practise, either as attorneys or counsellors; but though the characters are united in one person, the functions of attorney and counsel are as distinct here as in England. Our counsel then, as attorneys, appear for suitors, representing them before the court as their substitutes, and in their absence; but as counsel, they likewise appear to manage and conduct the suit through all its subsequent progress. As counsel, not as attorneys, they appear for those who are before the court *in propriis personis*, for he who appears in his own person, cannot appear by attorney; and as counsel, not as attorneys, they appear for guardians, who must appear in their proper persons. Upon the entry of the names upon the margin of the record, some observations were made in reference to the fourth objection of the special demurrer. These entries are often made in our practice, after the appearance by the party, or by attorney. When a counsel is taken in at the trial court, it is not unusual, I believe, for him thus to enter his name. The entry, denoting, as it may, either an appearance by attorney, or an appearance by counsel, is to be construed by the fact, and not the fact by the entry. To resort to the supposition before made, that the writ in this case had been against *Jane Watson*, and the minors (naming them) by the said *Jane Watson* their guardian; would the marking of the names of the counsel employed by her, have furnished the slightest objection? But as it was not necessary under any circumstance, that the writ should have been so framed, and according to the facts it could not have been so framed in the present case; can that *now* be any valid objection, which an immaterial and unnecessary addition would have obviated? Every thing appears to have been done by the guardian in defence of this action, that the protection of the minors (the principle on which the institution of guardianship is founded) required to be done. And indeed, such was *Jane Watson's* situation as co-defendant, with interests in the cause similar to those of her children, that she could not have omitted any thing essential which her duty as guardian demanded, without sacrificing her own rights, together with those of her wards. There has been then, in fact, and to every beneficial purpose, an appearance of the minors by their guardian: shall it be said that all this is to go for nothing, because the record has not, by some formal entry, exhibited the fact of such appearance? This proposition it would be difficult to maintain, even by the strict precedents of English proceedings. Many acts of parliament now in force, require attorneys to file their warrants in every action, yet the practice has wholly fallen into disuse, and warrants of attorney are in England neither taken or filed. By an act of 25 *George* 3, it is enacted, that no attorney shall com-

[Mercer v. Watson ]

mence an action, or appear for any defendant by a warrant of attorney, written or verbal, without delivering a memorandum or minute to the proper officer to be filed of record. Yet no omission or defect in the entering and filing of this memorandum shall vitiate the proceedings. Our own act of assembly of the 22d of May 1722, requires the attorney for the plaintiff in every action to file his warrant of attorney in the prothonotary's office, the same court that he declares; and the attorney for the defendant, the same court he appears ; and provides, that if they neglect to do so, they shall have no fees, nor be suffered to speak in the cause until they file their warrants respectively, evidently intending that this should be the only proper and allowable evidence to the court of the authority of the attorney to appear in the suit. But it is not the practice, and I presume never has been, in this state, to file or take warrants of attorney ; still, however, the attorneys receive their fees and speak, without their authority ever being called in question. We have seen by the case already cited from *Carthew*, that although it is error in England, if the guardian be not in fact admitted by the court, yet the omission of the fact on the roll is immaterial ; so, applying the reason of that case to the present, I would say, it is of no consequence that the appearance of the guardian is not entered on this record, for if she had not *in fact* applied, it would have been error.

The cases of *Beverly* v. *Miller,* 6 *Mumford's Rep.,* and *Priest et al.* v. *Hamilton,* 2 *Tyler's Rep.* support the conclusions to which I am led, being similar decisions upon facts much less forcible. It appears, that neither in Virginia nor Vermont have they any law with a provision like that contained in the seventh section of our act of 27th of April 1713, but that the minor defends by guardian specially admitted by the court. In *Priest et al.* v. *Hamilton,* the infant had no guardian except the natural guardian his father, who was not connected with the suit as a party, who merely employed attorneys to defend the minor in the action ; but who was not cited as guardian, nor was he appointed or admitted as guardian by the court. On demurrer, such appearance was nevertheless held to be sufficient. In *Beverly* and *Miller's* case, the special admission of the guardian by the court is recognized as the regular proceeding in Virginia ; but where a suit against infants was defended by their mother, who had been appointed guardian by the county court, and her answer was received for them, and full defence made under the sanction and authority of the chancery court, the infants were then held to be equally bound by such defence, as if she had been in form appointed by the court guardian *ad litem.* This, it is true, is a case in chancery, but I do not find that the court of chancery is in any degree less strict respecting the admission of guardians and the defence of minors, than the courts of common law. In England, the rule in chancery is rigid, that an infant must appear and defend by guardian ; and must either come into court to have him appointed, or there must be a commission for

2 u

that purpose. Even where an infant was abroad and could not be brought into court, Lord *Eldon* refused to make an order permitting his mother to put in an answer as guardian, but said, that a commission must go.

There is, however, another view of the proceedings in the present case, which seems to be conclusive, and with which I shall close this argument. In a regular record, the plea for the appearance of the defendant, is in the commencement of the plea, of which it forms a principal part. The plea in this ejectment was entered, conformably to our practice, in short, thus, " defendants plead Not guilty." But pleading in short is matter of indulgence, not of right, for the adverse party may insist and the court may order that the plea be drawn up at length, the short plea or entry being regarded only as a substitute for the full and perfect plea. The counsel having undertaken to defend the rights of the minors in this action, as well as those of *Jane Watson,* were bound to do it in a proper manner, and they did so, by the plea which they caused to be entered and exerted themselves to maintain. The short entry, " defendants plead Not guilty," is equivalent to, and stands for, the full and perfect plea drawn out in form, which would run thus: "and the aforesaid *Jane Watson,* in her proper person (or by *James Hopkins,* her attorney), and the aforesaid *Patterson Watson, Hetty Watson, Maria Watson* and *Jane Watson,* who are minors under the age of twenty-one years, by the said *Jane Watson,* their guardian, come and defend the force and injury when, &c. and say that they are not guilty of the said supposed trespasses and ejectment above laid to their charge, or any part thereof, in manner and form as he, the said *John Mercer,* hath above complained against them, and of this they put themselves upon the country, &c." Under the facts and circumstances of this case, therefore, the short plea of Not guilty does in legal contemplation include the statement of a regular appearance of the minors by their lawful guardian, and it does not lie in the mouth of the defendants, especially, who have chosen to use the indulgence of pleading in short, to object to this legal, fair and equitable construction.

To conclude, some apology might be deemed necessary for the great and unusual length of this opinion, were not a thorough investigation of the questions raised upon the demurrer demanded by the peculiar circumstances and course of these proceedings and by the importance of the questions themselves.

I also acknowledge a desire of evincing to the counsel that I have not been inattentive to their arguments, and whatever may be the ultimate issue, I have at least endeavoured to find out and pursue the true path to the justice of this case.

Let judgment be entered for the defendants in error.

Errors assigned.

1. There is error in the answers of the court to each of the points of law propounded by the counsel for the defendants.

[Mercer v. Watson.]

2. The verdict is illegal and out of the issue, and the judgment entered upon it irregular and void.

3. There is error in rendering judgment on the demurrer joined, and in each and every part of the opinion of the court on the general and special demurrer in all the causes of demurrer.

4. The general errors.

The opinion of the Court was delivered by

GIBSON, C. J.—To enable married women to convey their estates gratuitously or for value, they were clothed, by the act of 1770, with the capacity of *femes soles*, subject to the concurrence of the husband, and the examination of a magistrate to guard against an improper use of his influence. The cause which induced the supplementary provision of 1826, is recited to be, that conveyances of estates "sold for a legal and sufficient consideration," had failed of effect, by reason of an opinion entertained by the courts, that a specification of the particulars was essential to the validity of the separate examination; and hence an argument that the benefit of the provision was intended for none but purchasers. Undoubtedly a sale is put as an instance in the preamble; but the enacting clause is applicable in its terms to every "*bona fide* conveyance" whatever. What may have been meant by these words, can not be determined with certainty, from the context or their intrinsic meaning. A restraint of the remedy to *bona fide* transactions may have been intended to leave the question of actual imposition or constraint an open one, in order to let in proof to rebut the inference of fairness and free agency, to be drawn in the first instance from the naked fact of acknowledgement; but the words certainly have no relation to a purchase, nor do they indicate the presence of a valuable consideration, or any thing, perhaps, beside an untrammelled intent to pass the estate. Certainly there was no design to clog the remedy with distinctions between volunteers and purchasers, or to establish one rule for a gift to a parent or child, and another for a sale which is but a gift to the husband of the purchase money; for it can be of little value to the question, whether the consequence is eventually to put him in possession of the estate or the price of it. There was evidently no purpose to change the measure of the wife's protection under the original act; the object plainly being, to restore it to what was supposed to be the true construction of it, whether the transaction were a gift or a purchase, and not to assign a double meaning to the same words, by retaining the interpretation of the courts as to the one class of grantees and discarding it as to the other. The effect of a recital in the preamble of a statute was shown in *Seidenbender* v. *Charles,* 4 *Serg. & Rawle* 151, to be insufficient to control the enacting clause, unless to avoid an unexpected mischief or a monstrous injustice, neither of which is apparent here.

It is contended, however, that the act ought to be so construed as to exclude the present case, by reason of the judgment which had passed in a previous action for the defendants: and for this, reliance

[Mercer v. Watson.]

is had on the decision in *Barnet* v. *Barnet*, 15 *Serg. & Rawle* 72, in which, however, no more was decided than that the abrogation of a rule which had made a different case, did not render a judgment erroneous pending the writ of error, which was free from error when it was rendered. Certainly the supplemental act was not intended to operate retrospectively on the regularity of judicial proceedings, its object being to affect the evidence of title; and it would have been strange had this court so construed it as to make that erroneous by relation, which had been done in pursuance of its own decision. The argument would be incontrovertible, if a judgment in ejectment were conclusive of the title; but the decision had regard to the right of possession, not as it appears now, but as it appeared then, when governed by a rule which no longer exists. In a second ejectment, the judgment is on the facts as they are presented, however modified by intervening rules of evidence, or the ability of the parties to produce new proof.

The constitutionality of the act presents a subject already exhausted. The question of its consistency with the constitution of the state, was put at rest by the decision in *Tate* v. *Stoolsfoos*, 16 *Serg. & Rawle* 35, and *Barnet* v. *Barnet*, already cited; nor would we have suffered it to be argued as regards the constitution of the United States, were it not intimated that the object of raising the point here, is to submit it to the court of the last resort. For myself, I am not one of those who perceive a constitutional blemish in every statute which impinges on existing rights, and who hold the enactment of it to be in contravention of the inherent principles of a written constitution. Retrospective laws are doubtless unjust in theory, and indefensible in practice, where they are not employed as a corrective of some intolerable mischief; but where the rights which they are intended to affect, are unguarded by a specific prohibition, the question of morality, as well as of policy, is for the determination of the legislature. Our inquiry, then, is a simple one—What are the specific limitations which are imposed on state legislation by the constitution of the United States? They are all contained in the tenth section of the first article; and but the inhibition of *ex post facto* laws, and laws impairing the obligation of contracts, can be made to operate on the subject of the present controversy even by the most strained construction.

*Ex post facto* laws are necessarily retrospective: they act on existing rights, or they do not act at all. Yet the converse does not hold; for it seems to be universally conceded, since the decision in *Calder* v. *Bull*, 3 *Dall.* 386, that retrospective laws are not necessarily *ex post facto* within the meaning of the constitution. In that case, the prohibition was held to be exclusively applicable to penal laws; such as would impart criminality to an act that was indifferent at the time, or increase the criminality of an offence already committed, or deprive a prisoner of a privilege or advantage in relation to the measure of the proof or the course of the trial. These are plainly forbidden.

[Mercer v. Watson.]

But in matters of civil jurisprudence, statutes simply retrospective have not been disregarded by the courts, but for disobedience of some plain, palpable and positive mandate of the constitution.   This was distinctly asserted by Mr Justice *Washington*, in delivering the judgment of the court in *Satterlee* v. *Matthewson*, 2 *Peters* 411, and shown to be entirely consistent with decisions that had been thought to bear the other way.   In *Calder* v. *Bull*, a distinction was expressly taken between *ex post facto* and retrospective laws; the prohibition of the former being protective of the person, and the security of property being referable to the clauses which forbid a tender to be made in any thing but coin, or the sanctity of contracts to be violated.   These clauses, it was justly remarked, would be redundant, were the prohibition of *ex post facto* laws so largely construed as to extend it to the protection of both person and property ; as it would cover the whole subject.   But taking that to be otherwise, the law in question carries with it no actual pretension of power to interfere with vested rights.   The act of 1770 empowered the magistrate to make the separate examination, but omitted to declare what should be evidence of the fact.   The practice has been to perpetuate it by the magistrate's certificate, in analogy to the direction of the act of 1715, and this court had thought itself bound by analogies from the case of a fine, to require the essential parts of the transaction to be specially set out, in default of which, it was held, not that the conveyance was void, but that the grantee had failed to produce the requisite proof of its execution.   By interfering with the existing decisions, so far as to declare that a certificate of the fact of acknowledgement should be taken to import a compliance with all the requisitions of the law, the legislature undertook to deal, not with the contract, but the evidence of it.   In what then had the party to be affected a vested right ?   If in nothing but the quality and effect of the evidence, his right was possessed of no peculiar sanctity. · An act to change the rule which requires subscribing witnesses to be called, could not be said to affect a right, even so far as to incline a judge towards a construction favourable to an exemption from its operation of instruments in existence at the time of its enactment.   It might be otherwise, were attestation by subscribing witnesses, as in the case of a will of land under the statute of frauds, an essential ingredient in the act of execution.   Here, however, a specification of its ingredients was not an essential part of the acknowledgement, or of the separate examination, but a form and measure of proof, exacted, not by the legislature, but the courts ; and in substituting a different one, the legislature dispensed with no part of the separate examination or acknowledgement, either in substance or in form ; but in accordance with the common law maxim *omnia rite presumuntur*, declared a certificate of the naked fact of acknowledgement, to be at least *prima facie* evidence of every thing necessary to constitute the whole fact. I take it, then, the supplemental act divests no right, and that it might not be unconstitutional if it did.

Most of the preceding remarks are equally applicable to another branch of the argument, whose object has been to show the act to be in derogation of the contract. I pass without remark the notion, that it would impair the patent, which certainly is no less effective than it ever was to pass the title from the state. No contract can be impaired by it, but that which is the immediate subject of its operation. That it operates not on the title, but the evidence of it, I have attempted to show ; and if even without success, it is still sufficient that its tendency is not to impair the contract, but affirm it. That it is one thing to annul a contract, and another to establish it, was determined in *Hess* v. *Wurts*, 4 *Serg. & Rawle* 356, in which a statute passed in maintenance of an action on the notes of certain unincorporated banks, was sustained, though the effect of it was to set up a contract which had been declared a nullity. And in *Satterlee* v. *Matthewson*, 16 *Serg. & Rawle* 169, a void lease was validated by a statute, which was determined to be constitutional, though operating in the particular instance on a case adjudicated. I rely on that case with peculiar confidence, not only because it is in all respects what the argument has assumed the case at bar to be, but because the decision of it has been affirmed in all its bearings, by the supreme court of the United States, where the distinction between the destruction and the establishment of a contract was taken and sustained. Even Mr Justice *Johnson*, who dissented as to that, concurred in maintaining the competency of the legislature to declare the law retrospectively, so as to revise and overrule the decisions of the judiciary, a principle broad enough to cover the whole case. After a decision of the very point in terms so positive, it is idle to pursue the inquiry ; and I dismiss it to turn again to matters of domestic and exclusive jurisdiction.

Nothing can be more purely technical, than the exception to the record of the writ of error *coram vobis*. That the supposed clerical slip in recording the defendants' appearance deprived them of any protection or advantage they would otherwise have had, is not pretended, and the exception is therefore entitled to no peculiar favour. In the application of rules of practice, respect is to be had, not only to the general inadvertence of the profession to matters of this sort, but to the inexperience of the prothonotaries, which frequently compels us to dispense with the form, in order to preserve the substance of justice. Our records are seldom, if ever, put into form, and the evidence of our judicial proceedings is suffered to rest in minutes or short entries, which are in truth but the material from which a record is constructed elsewhere. In the case before us, the only evidence of an appearance at all, is the customary entry of the names of counsel in the margin of the docket ; by which, however, the prothonotary would have been authorized to make up the record for the writ of error *coram vobis*, so as to show, according to the truth of the fact, that the infant defendants had actually appeared and made defence by their guardian, who was also a co-defendant; or the defect,

being a clerical one, might have been amended even after error brought. An application to amend, therefore, would have set the matter right, or the plaintiff instead of pleading specially to the assignment, might have put the truth of it in issue. Instead, however, of having recourse to the record for its substance and effect, he has put his case on the facts contained in the special plea. But these are precisely what might have been made to result from the record without pleading; the entry of the appearance, like the memorandum of a judgment, being in point of effect what it ought to be in point of form. The only question then is, whether this legal effect can be shown in a case like the present, by plea and averment. I know of no principle which forbids it, especially in a proceeding where an inference of error, depending on extrinsic facts, may be rebutted by other facts. Perhaps, after all, to plead specially was the better course. It is unnecessary to go into a more particular examination of this point, the bearing of the subject having been accurately explored by the judge who ruled the cause below, whose conclusions are sustained both by reason and authority.

The remaining errors require but a passing notice. It is impossible to discover why a verdict could not be rendered in favour of the surviving executor, and none has been shown. As to the notion that a verdict may be available for some purposes though set aside, it is sufficient to say that the act is applicable to none but a verdict which is final in the cause; else two verdicts in the same action, though set aside for misdirection or reversed by writ of error, would constitute an independent title at the third trial. It has also been suggested, that the defendants have acquired title by the statute of limitations. No part of the evidence is on our paper books, and we would therefore be unable to form an opinion on the subject, were it even proper to express one; but we could not in any event decide, as a matter in the cause, what was not the subject of decision below. A bill of exceptions removes not the whole cause for revision on the merits, but a specific point decided by the court and excepted to by the party. Defence was not taken on the statute of limitations, or at least no point in regard to it was made a subject of exception, and therefore none such is for inquiry here.

Judgment affirmed.